WISCONSIN ET AL. *v.* ILLINOIS ET AL.

MICHIGAN *v.* ILLINOIS ET AL.

NEW YORK v. ILLINOIS ET AL.

Nos. 7, 11, and 12, Original. Argued March 12, 13, 1930.—Decided April 14, 1930.

*Messrs. Raymond T. Jackson,* Special Assistant Attorney General of Wisconsin; *Gilbert Bettman,* Attorney General of Ohio; *Wilbur M. Brucker,* Attorney General of Michigan; and *Newton D. Baker,* Special Assistant Attorney General of Ohio; with whom *Messrs. John W. Reynolds,* Attorney General, *Herman L. Ekern,* Special Assistant Attorney General, and *Herbert H. Naujoks,* Assistant Attorney General, of Wisconsin; *Henry N. Benson,* Attorney General of Minnesota; and *Cyrus E. Wood,* Attorney General and *Thomas E. Taylor,* Deputy Attorney General, of Pennsylvania, were on the brief, for the complainant States of Wisconsin, Minnesota, Ohio, Pennsylvania, and Michigan.

*Mr. Hamilton Ward,* Attorney General of New York, submitted for the complainant State of New York.

*Messrs. John W. Davis, James M. Beck* and *Edmund D. Adcock,* with whom *Messrs. Oscar E. Carlstrom,* Attorney General of Illinois, *Walter E. Beebe, George F. Barrett, James Hamilton Lewis, Louis J. Behan, William P. Sidley* and *Cornelius Lynde* were on the brief, for the defendants, the State of Illinois and the Sanitary District of Chicago.*

---

* *Mr. Carlstrom* appeared as representing the State of Illinois; *Mr. Beebe* as Attorney, and *Messrs. Barrett* and *Adcock* as Solicitors, of the Sanitary District of Chicago. *Messrs. Davis, Beck, Lewis,* and

*Behan* appeared as counsel for the Sanitary District, as did also *Messrs. Sidley* and *Lynde,* the last two representing the Association of Commerce of Chicago.

*Mr. Lewis* was present at the argument, but yielded his time to *Mr. Adcock.*

192

194

**196**

Messrs. *Stratton Shartel,* Attorney General of Missouri, *J. W. Cammack,* Attorney General of Kentucky, *Charles H. Thompson,* Attorney General of Tennessee, *Percy Saint,* Attorney General of Louisiana, *Rush H. Knox,* Attorney General of Mississippi, *Hal L. Norwood,* Attorney General of Arkansas, and *Daniel N. Kirby,* on behalf of the Mississippi Valley States, intervening defendants, joined in the foregoing brief.

MR. JUSTICE HOLMES delivered the opinion of the Court.

These suits, brought to prevent the State of Illinois and the Sanitary District of Chicago from continuing to withdraw water from Lake Michigan as they now are doing, have passed through their first stage in this Court. The facts were set forth in detail and the law governing the parties was established by the decision reported in 278 U. S. 367. It was decided that the defendant State and its creature the Sanitary District were reducing the level of the Great Lakes, were inflicting great losses upon the complainants and were violating their rights, by diverting from Lake Michigan 8,500 or more cubic feet per second into the Chicago Drainage Canal for the purpose of diluting and carrying away the sewage of Chicago. The diversion of the water for that purpose was held illegal, but the restoration of the just rights of the complainants was made gradual rather than immediate in order to avoid so far as might be the possible pestilence and ruin with which the defendants have done much to confront themselves. The case was referred a second time to the master to consider what measures would be necessary and what time required to effect the object to be attained. The master now has reported. Both sides have taken exceptions, but, as we shall endeavor to show, the issues open here are of no great scope.

The defendants have submitted their plans for the disposal of the sewage of Chicago in such a way as to diminish so far as possible the diversion of water from the Lake. In the main these plans are approved by the complainants. The master has given them a most thorough and conscientious examination. But they are material only as bearing on the amount of diminution to be required from time to time and the times to be fixed for each step, and therefore we shall not repeat the examination. It already has been decided that the defendants are doing a wrong to the complainants and that they must stop it. They must find out a way at their peril. We have only to consider what is possible if the State of Illinois devotes all its powers to dealing with an exigency to the magnitude of which it seems not yet to have fully awaked. It can base no defences upon difficulties that it has itself created. If its constitution stands in the way of prompt action it must amend it or yield to an authority that is paramount to the State.

The defendants' exceptions deal with the extent to which the diversion of water should be reduced and to the time at which the reductions should take place. They argue that a recent rise in the level of Lake Michigan should be taken into account. This cannot be done. Apart from the speculation involved as to the duration of the rise, there is a wrong to be righted, and the delays allowed are allowed only for the purpose of limiting, within fair possibility, the requirements of immediate justice pressed by the complaining States. These requirements as between the parties are the constitutional right of those States, subject to whatever modification they hereafter may be subjected to by Congress acting within its authority. It will be time enough to consider the scope of that authority when it is exercised. In present conditions there is no invasion of it by the former decision of this Court, as urged by the defendants. The

right of the complainants to a decree is not affected by the possibility that Congress may take some action in the matter. See *Southern Utilities Co.* v. *Palatka,* 268 U. S. 232, 233. *Kansas* v. *Colorado,* 206 U. S. 46, 117.

The master finds that, on and after July 1, 1930, the diversion of water from Lake Michigan should not be allowed to exceed an annual average of 6,500 cubic feet per second in addition to what is drawn for domestic uses. He finds that when the contemplated controlling works are constructed that are necessary for the purpose of preventing reversals of the Chicago River at times of storm and the introduction of storm flow into Lake Michigan, works that will require the approval of the Secretary of War and that the master finds should be completed and put in operation within two years after the approval is given, and probably by December 31, 1935, the diversion should be limited to an annual average of 5,000 c. f. s. " in addition to domestic pumpage." On this point we deal only with the amount and the time. When the whole system for sewage treatment is complete and the controlling works installed he finds that the diversion should be cut down to an annual average of 1,500 c. f. s. in addition to domestic pumpage. This, he finds, should be accomplished on or before December 31, 1938; and the full operation of one of the contemplated works, the West Side Sewage Treatment Plant, which would permit a partial reduction of the diversion, is to be not later than December 31, 1935. These recommendations are subject to the appointment of a commission to supervise the work, or, better in our opinion, to the filing with the clerk of this Court, at stated periods, by the Sanitary District, of reports as to the progress of the work, at the coming in of which either party may make application to the Court for such action as may seem to be suitable. All action of the parties and the Court in this case will be subject, of course, to any order that Congress may

make in pursuance of its constitutional powers and any modification that necessity may show should be made by this Court. These recommendations we approve within the limits stated above, and they will be embodied in the decree. The defendants argue for delay at every point but we have indicated sufficiently why their arguments cannot prevail. The master was as liberal in the allowance of time as the evidence permitted him to be.

The exceptions of the complainants go mainly to a point not yet mentioned. The sewage of Chicago at present is discharged into a canal that extends to Lockport on the Des Plaines River, (which flows into the Illinois, which in its turn flows into the Mississippi,) from Wilmette on the north and a point on the Lake near the boundary line of Indiana on the south, with another intake midway between these two at the mouth of the Chicago River, which has been reversed from its former flow into Lake Michigan to a flow from the Lake. The change is narrated at length in the former decision of this case. 278 U. S. 367, 401, *et seq.* See also *Missouri* v. *Illinois,* 180 U. S. 208, 211, *et seq.* s. c. 200 U. S. 496. It is partially to oxidize and carry off this sewage that the main diversion of water is made. The complainants demand that this diversion cease, and the canal be closed at Lockport, with an incidental return of the Chicago River to its original course. They also argue that what is called the domestic pumpage after being purified in the sewage works be returned to the Lake. These demands seem to us excessive upon the facts in this case. The master reports that the best way of preventing the pollution of navigable waters is to permit an outflow from the Drainage Canal at Lockport, and that the interests of navigation in the Chicago River as a part of the port of Chicago will require the diversion of an annual average of from 1,000 c. f. s. to 1,500 c. f. s. in addition to domestic pumpage after the sewage

treatment program has been carried out. The canal was opened at the beginning of the century, thirty years ago. In 1900 it already was a subject of litigation in this Court. The amount of water ultimately to be withdrawn unless Congress may prescribe a different measure is relatively small. We think that upon the principles stated in *Missouri* v. *Illinois,* 200 U. S. 496, 520, *et seq.,* the claims of the complainants should not be pressed to a logical extreme without regard to relative suffering and the time during which the complainants have let the defendants go on without complaint.

Perhaps the complainants would not be very insistent with regard to the 1,000 or 1,500 c. f. s. which earlier in this case they seemed to admit to be reasonable, if their demand were allowed that the domestic pumpage be purified and returned to the Lake—a demand not contemplated by their bill. But purification is not absolute. How nearly perfect it will be with the colossal works that the defendants have started is somewhat a matter of speculation. The master estimates that with efficient operation the proposed treatment should reach an average of 85 per cent purification and probably will be 90 per cent or more. Even so we are somewhat surprised that the complainants should desire the effluent returned. The withdrawal of water for domestic purposes is not assailed by the complainants and we are of opinion that the course recommended by the master is more reasonable than the opposite demand. If the amount withdrawn should be excessive, it will be open to complaint. Whether the right for domestic use extends to great industrial plants within the District has not been argued but may be open to consideration at some future time.

We see no reason why costs should not be paid by the defendants, who have made this suit necessary by persisting in unjustifiable acts. *North Dakota* v. *Minnesota,* 263 U. S. 583.

A decree will be entered to the effect that, subject to such modifications as may be ordered by the Court hereafter,

1. On and after July 1, 1930, the defendants, the State of Illinois and the Sanitary District of Chicago, are enjoined from diverting any of the waters of the Great Lakes-St. Lawrence system or watershed through the Chicago Drainage Canal and its auxiliary channels or otherwise in excess of an annual average of 6,500 c. f. s. in addition to domestic pumpage.

2. That on and after December 31, 1935, unless good cause be shown to the contrary the said defendants are enjoined from diverting as above in excess of an annual average of 5,000 c. f. s. in addition to domestic pumpage.

3. That on and after December 31, 1938, the said defendants are enjoined from diverting as above in excess of the annual average of 1,500 c. f. s. in addition to domestic pumpage.

4. That the provisions of this decree as to the diverting of the waters of the Great Lakes-St. Lawrence system or watershed relate to the flow diverted by the defendants exclusive of the water drawn by the City of Chicago for domestic water supply purposes and entering the Chicago River and its branches or the Calumet River or the Chicago Drainage Canal as sewage. The amount so diverted is to be determined by deducting from the total flow at Lockport the amount of water pumped by the City of Chicago into its water mains and as so computed will include the run-off of the Chicago and Calumet drainage area.

5. That the defendant the Sanitary District of Chicago shall file with the clerk of this Court semi-annually on July first and January first of each year, beginning July first, 1930, a report to this Court adequately setting forth the progress made in the construction of the sewage treatment plants and appurtenances outlined in the program as proposed by the Sanitary District of Chicago, and also

setting forth the extent and effects of the operation of the sewage treatment plants, respectively, that shall have been placed in operation, and also the average diversion of water from Lake Michigan during the period from the entry of this decree down to the date of such report.

6. That on the coming in of each of said reports, and on due notice to the other parties, any of the parties to the above entitled suits, complainants or defendants, may apply to the Court for such action or relief, either with respect to the time to be allowed for the construction, or the progress of construction, or the methods of operation, of any of said sewage treatment plants, or with respect to the diversion of water from Lake Michigan, as may be deemed to be appropriate.

7. That any of the parties hereto, complainants or defendants, may, irrespective of the filing of the above-described reports, apply at the foot of this decree for any other or further action or relief, and this Court retains jurisdiction of the above-entitled suits for the purpose of any order or direction, or modification of this decree, or any supplemental decree, which it may deem at any time to be proper in relation to the subject matter in controversy.

The CHIEF JUSTICE took no part in the consideration or decision of these cases.