WISCONSIN ET AL. *v.* ILLINOIS ET AL.*

No. 5, original. Argued April 17, 1933.—Decided May 22, 1933.

---

*Together with No. 8, original, *Michigan* v. *Illinois et al.,* and No. 9, original, *New York* v. *Illinois et al.*

*Mr. Raymond T. Jackson,* with whom *Messrs. J. E. Finnegan,* Attorney General of Wisconsin, *Patrick H. O'Brien,* Attorney General of Michigan, *Harry H. Peterson,* Attorney General of Minnesota, *John W. Bricker,* Attorney General of Ohio, *Gerald K. O'Brien,* Deputy Attorney General of Michigan, *Joseph G. Hirschberg,* Deputy Attorney General of Wisconsin, *Herman L. Ekern,* Special Assistant Attorney General of Wisconsin, and *Herbert H. Naujoks,* Assistant Attorney General of Wisconsin, were on the brief, for complainants.

*Mr. Cornelius Lynde,* Special Assistant Attorney General of Illinois, with whom *Messrs. Otto Kerner,* Attorney General, and *Truman A. Snell,* Assistant Attorney General, were on the brief, for the State of Illinois, defendant.

*Messrs. Joseph B. Fleming* and *William Rothmann,* with whom *Messrs. James Hamilton Lewis, Joseph H. Pleck, Frank Johnston, Jr.,* and *Lawrence J. Fenlon* were on the brief, for the Sanitary District of Chicago, defendant.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

In October, 1932, complainant States, Wisconsin, Minnesota, Ohio and Michigan, applied for the appointment of a commissioner or special officer to execute the decree of April 21, 1930 (281 U.S. 696) on behalf and at the expense of defendants. The applicants complained of the delay in the construction of the works and facilities embraced in the program of the Sanitary District of Chicago for the treatment and disposition of sewage so as to obviate danger to the health of the inhabitants of the District

on the reduction, as the decree provides, of the diversion of water from Lake Michigan through the Drainage Canal. The Court directed defendants to show cause why they have not taken appropriate steps to effect compliance with the requirements of the decree.

After hearing upon the return to the rule, the Court appointed Edward F. McClennen as Special Master to make summary inquiry and to report to the Court (1) as to the causes of the delay in obtaining approval by the Secretary of War of the construction of controlling works in the Chicago River and the steps which should now be taken to secure such approval and prompt construction; (2) as to the causes of the delay in providing for the construction of the Southwest Side Treatment Works and the steps which should now be taken for that purpose or, in case of a change in site, for the construction of an adequate substitute; and (3) as to the financial measures on the part of the Sanitary District or the State of Illinois which are reasonable and necessary in order to carry out the decree of the Court. 287 U.S. 578. The Master has proceeded accordingly, and, after full hearing and careful review of the evidence received by him, has submitted his report and recommendations, upon which the parties have been heard.

The Master has found that the causes of the delay in obtaining approval of the construction of controlling works in the Chicago River " are a total and inexcusable failure of the defendants to make an application to the Secretary of War for such approval," and that the causes of the delay in providing for the construction of the Southwest Side Treatment Works " are (1) an inexcusable and planned postponement of the beginning of construction of these Works to January 1, 1935, which left an inadequate time for their completion before December 31, 1938, at the rate of progress expected or to be expected under the methods pursued by the Sanitary District, and

(2) the failure to proceed to a definite decision as to a site and to the acquisition of the site so chosen, and (3) the failure to proceed .with reasonable diligence to prepare designs, plans, and specifications for the Works at this site or on the site of the West Side Works." The evidence taken by the Master supports these findings.

With respect to the steps which should now be taken to secure completion of the works above mentioned, the Master finds that, because of its financial situation, the defendant Sanitary District is at present powerless to contract " for the design or for the construction of controlling works, or for the construction in a large way of the Southwest Side Treatment Works." This is found to be due to the unmarketability of its bonds and its inability to obtain the needed moneys through levy of taxes or assessments. The Master finds that " in the conditions which now exist, there is no reasonable financial measure which the Sanitary District can take, which it is failing to take "; and that " no way has come to light, whereby this decree can be performed under tolerable conditions, unless. the State of Illinois meets its responsibility and provides the money." The Master recommends that the decree be enlarged so as to require the State of Illinois to provide the moneys necessary and to take the appropriate steps to secure the completion of adequate facilities for the treatment and disposition of sewage in order to carry out the decree of this Court.

*First.* The State of Illinois raises questions as to its relation to this suit and its obligation under the decree. Counsel for the State present the view that the Sanitary District is the " active defendant," and that, while no objection has been, or is made, to the joining of the State as a party defendant, there has been no determination in this suit as to the exact nature and extent of the " legal liability of the State of Illinois for the acts of the Sanitary District," and that this Court " should not now assume the

400

existence of a legal liability on the part of the State." This argument is untenable.

In this controversy between States, the State of Illinois by virtue of its status and authority as a State is the primary and responsible defendant. While the Sanitary District is the immediate instrumentality of the wrong found to have been committed against the complainant States by the diversion of water from Lake Michigan, that instrumentality was created and has continuously been maintained by the State of Illinois. Every act of the Sanitary District in establishing and continuing the diversion has derived its authority and sanction from the action of the State, and is directly chargeable to the State. The adjudication as to the right of the complainant States to have the diversion reduced as provided in the decree is an adjudication not merely as against the Sanitary District but as against the State as the defendant responsible under the Federal Constitution to its sister States for the acts which its creature and agent, the Sanitary District, has committed under the State's direction.

This conclusion would be inevitable even if the Drainage Canal had been established solely as a project for local benefit, that is, for the sanitation of the area immediately concerned and thus to meet the needs of the inhabitants of the great metropolis within that area. But while the establishment and use of the Drainage Canal were primarily, as heretofore found, for the purpose of sanitation, the State did not authorize it with that purpose exclusively in view, but the canal project from its first initiation has been promoted by the State of Illinois to provide a waterway for general state purposes and the advantage of the people of the State at large. The Act of the state legislature of 1836 (Illinois Laws, 1834–37, p. 118), contemplated a canal to insure navigation and to be supplied with water from Lake Michigan and such other sources as the canal commissioner should think proper.

By the Act of 1861 (Illinois Laws, 1861, p. 277), the legislature provided for improvement in the canal and a larger flow of water from Lake Michigan. The menace from the pollution of the Chicago River through the introduction of sewage made it imperative to provide plans for purification, and while a waterway of such dimensions as to furnish ample dilution was regarded as the most economical plan, the advantages to the State of such a waterway as a highway of commerce were also in view. *Wisconsin* v. *Illinois*, 278 U.S. 367, 401–403, 419. When the provision was made in 1889 (Illinois Laws, 1889, p. 125) for the creation of sanitary districts to provide for drainage and to improve navigable waterways, the legislature, by joint resolution (Illinois Laws, 1889, p. 376), set forth " the policy of the State of Illinois to procure the construction of a waterway of the greatest practicable depth and usefulness for navigation from Lake Michigan by the Des Plaines and Illinois Rivers to the Mississippi River."

In this suit, the State of Illinois has defended from the beginning upon the ground that diversion was essential with reference not only to the needs of sanitation but also for a continuous waterway from the Lake to the Gulf. *Wisconsin* v. *Illinois, supra,* pp. 388, 396. But the Court found this contention unavailing and that the existing diversion was unlawful. The Court found no basis for the argument that the diversion had been authorized by the Congress. *Id.,* pp. 416–420.

After a full examination of the facts, and considering the questions presented in all their aspects, the Court deemed it to be its duty " by an appropriate decree to compel the reduction of the diversion to a point where it rests on a legal basis and thus to restore the navigable capacity of Lake Michigan to its normal level." *Id.,* p. 420. The " restoration of the just rights of the complainants was made gradual rather than immediate in order to avoid so far as might be possible pestilence and ruin with

which the defendants have done much to confront themselves." *Wisconsin* v. *Illinois* 281 U.S. 179, 196. The final decree fixed the time and amount of the reduction of the diversion with this object in view. *Id.* That decree in terms bound the State of Illinois, no less than its creature, the Sanitary District. In delivering the opinion of the Court, Mr. Justice Holmes summed up the matter by saying: " It already has been decided that the defendants are doing a wrong to the complainants and that they must stop it. They must find out a way at their peril. We have only to consider what is possible if the State of Illinois devotes all its powers to dealing with an exigency to the magnitude of which it seems not yet to have fully awaked. It can base no defences upon difficulties that it has itself created. If its constitution stands in the way of prompt action it must amend it or yield to an authority that is paramount to the State." *Id.*, p. 197.

*Second.* The State of Illinois and the Sanitary District contend that the provision of the Rivers and Harbors Act of July 3, 1930 (c. 847, 46 Stat. 918, 929) with respect to the Illinois waterway is an exercise of the paramount authority of the Congress and requires modification of the decree. That provision—an enactment made after the decree and in the light of its terms—is as follows:

" Illinois River, Illinois, in accordance with the report of the Chief of Engineers, submitted in Senate Document Numbered 126, Seventy-first Congress, second session, and subject to the conditions set forth in his report in said document, but the said project shall be so constructed as to require the smallest flow of water with which said project can be practically accomplished, in the development of a commercially useful waterway: *Provided,* That there is hereby authorized to be appropriated for this project a sum not to exceed $7,500,000: *Provided further,* That the water authorized at Lockport, Illinois, by the decree of the Supreme Court of the United States, rendered

April 21, 1930, and reported in volume 281, United States Reports, in Cases Numbered 7, 11, and 12 Original—October term, 1929, of Wisconsin and others against Illinois, and others, and Michigan against Illinois and others, and New York against Illinois and others, according to the opinion of the court in the cases reported as Wisconsin against Illinois, in volume 281, United States, page 179, is hereby authorized to be used for the navigation of said waterway: *Provided further*, That as soon as practicable after the Illinois waterway shall have been completed in accordance with this Act, the Secretary of War shall cause a study of the amount of water that will be required as an annual average flow to meet the needs of a commercially useful waterway as defined in said Senate document, and shall, on or before January 31, 1938, report to the Congress the results of such study with his recommendations as to the minimum amount of such flow that will be required annually to meet the needs of such waterway and that will not substantially injure the existing navigation on the Great Lakes to the end that Congress may take such action as it may deem advisable."

The text of the statute is a complete answer to defendants' contention. So far as the Congress purports to authorize a diversion of water from Lake Michigan for the navigation of the waterway, the authorization is explicitly limited to the amount allowed by the Court's decree. The Congress expressly withholds further action until there is opportunity to consider the results of the study which the Secretary of War is required to make. Meanwhile, and that is sufficient for the present purpose, nothing has been determined or enacted in any way conflicting with the terms of the decree. It is urged that the Act of Congress discloses an intention to control the extent of the diversion in aid of the waterway. We find in the provision no evidence of any controlling purpose. Intention and future action remain a matter of conjecture. Whatever its

intention or authority, the Congress has taken no action
which affects the operation of the decree but on the con-
trary has adopted the amount fixed in the decree as the
limit of permitted withdrawal.

*Third.* Similar considerations apply to the argument
based on the provisions of the Rivers and Harbors Act of
July 3, 1930,[1] and of the pending Treaty with Canada as
to the Great Lakes-St. Lawrence Waterway, in relation to
compensation works through which, it is urged, the res-
toration of lake levels may be effected. The reference is
to the construction of compensation works in the Niagara
and St. Clair rivers. Counsel for Illinois say that " upon
the adoption of this Treaty the appropriation made for
the projects authorized in the Rivers and Harbors Bill of
1930, including compensation works, by the War Depart-
ment Appropriation Bill of 1931, becomes immediately
available for carrying out this Treaty requirement," and
that the Court should assume that, either under the
Treaty or under the Act of 1930, compensation works with
the desired result will be installed. But it is apparent
that there is no basis for the suggested assumption. It
would be manifestly inappropriate to discuss the provi-
sions of the pending Treaty, bearing upon the diversion of
water from Lake Michigan, as the Treaty is not in effect.
And there is no ground for concluding that the compen-
sation works to which reference is made could be in-
stalled in the absence of treaty.[2] What, if anything, will
be done in the establishment of compensation works is
undetermined.

The decisive point is that nothing has been done which
affects the operation of the decree and that the obligation
of defendants to carry out its terms is in full force.

---

[1] Act of July 3, 1930 (c. 847, 46 Stat. 930); House Doc. No. 253, 70th
Cong., 1st Sess.

[2] See House Doc. No. 253, 70th Cong., 1st Sess., pp. 82, 84; Report
of Special Board of Engineers, pars. 164, 166, 182.

*Fourth.* Resisting the Master's recommendations for the enlargement of the decree, so as to insure compliance with its provisions, the State of Illinois contends that the terms of the decree have not yet been violated; that the decree is confined to relief through injunction against the continuance of the diversion beyond specified amounts at stated times. Counsel for the State argue that' measures for the protection of the lives and health of its citizens are exclusively within the police power of the State, and that no obligation to exercise that power is imposed upon the State by the Federal Constitution.

The argument ignores the fact that the question does not concern the ordinary exercise of the police power of the State, but rather concerns the duty of the State to take measures to end the condition which it has urged, and still urges, as a ground for the postponement of the relief to which the complainant States have been found to be entitled. The wrong has been inflicted and is a continuing one. The decision was that this wrong must be stopped. It was not stopped at once merely because of the plight of the residents of Chicago and the adjacent area, in whose interest time was sought to provide works and facilities for sewage disposal. The Court fittingly recognized this exigency. The Court directed a careful inquiry in order to ascertain the time necessary to provide adequate protection. The duty to supply that protection was, and is, the duty of the State. The Sanitary District, acting under the authority of the State—as its instrumentality—presented its program for the construction of sewage works. That program was thoroughly examined and was made the subject of report to the Court. After full hearing the Court fixed the times and extent of diminution of the diversion in the light of the time found to be necessary for carrying out that program. The reduction of the diversion was graduated accordingly. The decree required reports as to the progress of construction. The

Court retained jurisdiction of the cause and the decree provided that any of the parties complainants or defendants, might "apply to the Court for such action or relief, either with respect to the time to be allowed for the construction, or the progress of construction, or the methods of operation, of any of said sewage treatment plants, or with respect to the diversion of water from Lake Michigan, as may be deemed to be appropriate." 281 U.S. p. 698. The present application of complainants is based upon this provision of the decree and upon the charge that defendants have unwarrantably delayed the installation of the works which they sought an opportunity to supply before the injunction of the diversion should become effective.

In this aspect of the case, there is no room for the contention that the defendant State, if it were so disposed, by failing to provide protection for its people and by trusting to what it terms "the same compelling humanitarian necessity which originally induced the Court to postpone the final stoppage of diversion," could, in effect and according to its pleasure, by reason of the inability of the Court to impose specific requirements as to needed measures, delay or prevent the enforcement of the decree. The Court did not exhaust its power by the provisions enjoining the diversion according to the times and amounts prescribed. The Court omitted further specific requirements not because of want of power but in the expectation that the diligence of defendants in carrying out the program they had submitted to the Court would give no occasion for such specifications. In deciding this controversy between States, the authority of the Court to enjoin the continued perpetration of the wrong inflicted upon complainants, necessarily embraces the authority to require measures to be taken to end conditions, within the control of defendant State, which may stand in the way of the execution of the decree.

*Fifth.* We pass from questions of power to the consideration of the requirement that is now reasonable and necessary.

The Master was directed to report, in particular, with respect to the controlling works in the Chicago River and the Southwest Side Treatment Works, as these works appeared to be pivotal in defendants' program. The controlling works were proposed to avoid the danger of the pollution of the water supply of the City of Chicago by reversals of the Chicago River in times of storm. Because of that danger, it was not deemed to be practicable to direct a reduction of the diversion below the initial reduction to an annual average of 6500 cubic feet per second (required to be made by July 1, 1930) pending the completion of the sewage treatment works and without controlling works. Two years were found to be an adequate time for the installation of controlling works in the river after authorization by the Secretary of War. With this fact in view, the decree provided that unless good cause were shown to the contrary, the diversion should be reduced to 5000 cubic feet per second, in addition to domestic pumpage, on and after December 31, 1935. 281 U.S. pp. 198, 696. Not only were these controlling works embraced in defendants' construction program, but they have been set forth as a part of that program in all of the semi-annual reports filed by the Sanitary District under the decree. Despite this, it appears from the findings of the Master that no appropriate application and submission of plans for such works have been made to the Secretary of War, and the Master finds this delay to be inexcusable. He finds that it was not due to bad faith and that there was no intention to violate the decree. It is unnecessary to review the circumstances.

Defendants now assert, upon the conclusions reached by the Sanitary District engineers, that controlling works will not be needed so long as the diversion does not fall

below 5000 cubic feet per second (the limit fixed for December 31, 1935), and that if they are needed at a later time, appropriate proceedings for their installation will be taken. Formal representation is made to the Court as follows:

" The Sanitary District is prepared, upon the completion of the intercepting sewers along the main channel of the Chicago River adjacent to Lake Michigan, to accept the reduction to 5000 c.f.s. without controlling works. Upon this determination by the Sanitary District involving a conclusion on an engineering and sanitation problem which is not challenged by the complaining States, this Court has been relieved of responsibility and the grounds for the apprehension of the former Special Master have been removed. If the provision of the decree, directing a reduction in diversion to 1500 c.f.s. at the end of 1938, is not changed as a result of the study to be made by the Chief of Engineers under the Rivers and Harbors Act of July 3, 1930, and if it appears that controlling works are necessary to keep Lake Michigan free of pollution upon the completion of all sewage treatment projects, with a diversion of 1500 c.f.s., controlling works will be designed and constructed, if the War Department approves, to meet the reduction. Compulsion will be unnecessary."

The State of Illinois " joins with and affirms " the contention submitted by the Sanitary District with respect to these works, and in its separate brief states that " the defendants will undoubtedly be prepared under existing circumstances to accept the reduction called for by the original decree to 5000 c.f.s. at the end of 1935." In view of these representations, the Court does not deem it necessary at this time to enlarge the decree by a special requirement as to controlling works.

Upon the hearing preceding the entry of the decree, the vast plant known as the Southwest Side Treatment Works

was considered by all parties to be the critical, or controlling, factor in the sewage treatment program, as it was found to require the longest time to construct. The project involved the acquisition of site, preliminary studies, the designing of the plant, the awarding of contracts and the physical construction. The time necessary for completion was in sharp controversy. The former Special Master reported to the Court that a reasonable time for this purpose, assuming available funds, and thus for carrying out the entire program for sewage treatment, would be nine calendar years from January 1, 1930, that is, until December 31, 1938. On this basis, considering the time allowance to be as liberal as the evidence permitted, the Court fixed December 31, 1938, unless good cause were shown to the contrary, for the reduction of the diversion to the final limit stated in the decree. 281 U.S. pp. 198, 199, 697. Now it appears that, after more than three years, there has been no definite selection of site and that the contemplated proceedings for the construction of these works have not been taken.

The Master finds that the failure to purchase or condemn a site has not delayed construction because the Sanitary District has altered its plans. The Sanitary District has brought forward new methods which it asserts to be more economical both for construction and for operation. It appears that, without definite action, it has been virtually decided to place the works wholly on the presently owned site on which other works, known as the West Side Works, are located. The Master finds that it is " only by the exercise of unusual diligence that the time already lost to progress on the Southwest Side Treatment Works can be counteracted and the Works completed before December 31, 1938." But he also finds that " they can be completed by that date if the work of design and construction begins at once and is pressed vigorously." For our present purpose we take this last mentioned find-

ing as presenting the controlling fact, and we shall not attempt to review the charges and excuses as to the delay.

The finding of the Master that it is still possible to complete the sewage treatment works, within the time fixed by the decree for the ultimate limit of the diversion, finds support in the statements now submitted by the defendants. On the hearing before the Master the Sanitary District took the position that "ample time remains for this construction assuming that funds will be available" and "that a finding that the District will not obtain the necessary funds or will not construct these Works by December 31, 1938, is premature and unwarranted." And in its present argument before this Court the Sanitary District states:

"No delay has occurred which will affect the ultimate completion of the works before the end of 1938, except the delay caused by a lack of money. The evidence does not disclose that there need be any apprehension on the part of this Court as to the diligence it may expect from the Sanitary District. On the contrary, the testimony to which we have referred indicates that this Court may anticipate that the Sanitary District will act with all possible speed in the performance of work necessary to effect compliance with the decree."

The question, then, comes down to the procuring of the money necessary to effect the prompt completion of the sewage treatment works and the complementary facilities. To provide the needed money is the special responsibility of the State of Illinois. For the present halting of its work the Sanitary District is not responsible. It appears to be virtually at the end of its resources. The Master states that, due to its financial situation, the Sanitary District cannot go forward in any adequate manner with either contracts or construction. We find that the Master's conclusion, that there is no way by which the

decree can be performed under tolerable conditions " unless the State of Illinois meets its responsibility and provides the money," is abundantly supported by the record.

That responsibility the State should meet. Despite existing economic difficulties, the State has adequate resources, and we find it impossible to conclude that the State cannot devise appropriate and adequate financial measures to enable it to afford suitable protection to its people to the end that its obligation to its sister States, as adjudged by this Court, shall be properly discharged.

We do not undertake to prescribe the particular measures to be taken or to specify the works and facilities to be provided. But in view of the delay that has occurred and the importance of prompt action, and in order that there may be no ground for misapprehension as to the import of the decree or the duty of the defendant State, we think that complainant States are entitled to have the decree enlarged by the addition of the following provision:

" That the State of Illinois is hereby required to take all necessary steps, including whatever authorizations or requirements, or provisions for the raising, appropriation and application of moneys, may be needed in order to cause and secure the completion of adequate sewage treatment or sewage disposal plants and sewers, together with controlling works to prevent reversals of the Chicago River if such works are necessary, and all other incidental facilities, for the disposition of the sewage of the area embraced within the Sanitary District of Chicago so as to preclude any ground of objection on the part of the State or of any of its municipalities to the reduction of the diversion of the waters of the Great Lakes-St. Lawrence system or watershed to the extent, and at the times and in the manner, provided in this decree.

"And the State of Illinois is hereby required to file in the office of the Clerk of this Court, on or before October

2, 1933, a report to this Court of its action in compliance with this provision."

The decree will be enlarged accordingly and, except as thus provided, the application of complainant States is denied. Costs, including the expenses incurred by the Special Master and his compensation, to be fixed by the Court, shall be taxable against defendants. 281 U.S. p. 200.

*It is so ordered.*