# OHIO *v.* WYANDOTTE CHEMICALS CORP. ET AL.

No. 41, Orig.   Argued January 18, 1971—Decided March 23, 1971

HARLAN, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined.   DOUGLAS, J., filed a dissenting opinion, *post,* p. 505.

*Paul W. Brown,* Attorney General of Ohio, argued the cause and filed a brief for plaintiff.

*John M. Moelmann* argued the cause for defendant Wyandotte Chemicals Corp.   With him on the briefs were *Thomas J. Weithers* and *Milton F. Mallender.   Ian W. Outerbridge,* by special leave of Court, argued the cause for defendant Dow Chemical Co. of Canada, Ltd.   With him on the briefs was *Richard W. Galiher.   Harley J. McNeal* argued the cause and filed briefs for defendant Dow Chemical Co.

*Peter L. Strauss* argued the cause for the United States as *amicus curiae.*   With him on the brief were *Solicitor*

*General Griswold, Assistant Attorney General Kashiwa,* and *James R. Moore.*

*Frank J. Kelley,* Attorney General, *Robert E. Deren- goski,* Solicitor General, and *M. Robert Carr,* Assistant Attorney General, filed a brief for the State of Michigan as *amicus curiae.*

Mr. Justice Harlan delivered the opinion of the Court.

By motion for leave to file a bill of complaint, Ohio seeks to invoke this Court's original jurisdiction. Because of the importance and unusual character of the issues tendered we set the matter for oral argument, inviting the Solicitor General to participate and to file a brief on behalf of the United States, as *amicus curiae.* For reasons that follow we deny the motion for leave to file.

The action, for abatement of a nuisance, is brought on behalf of the State and its citizens, and names as defendants Wyandotte Chemicals Corp. (Wyandotte), Dow Chemical Co. (Dow America), and Dow Chemical Company of Canada, Ltd. (Dow Canada). Wyandotte is incorporated in Michigan and maintains its principal office and place of business there. Dow America is incorporated in Delaware, has its principal office and place of business in Michigan, and owns all the stock of Dow Canada. Dow Canada is incorporated, and does business, in Ontario. A majority of Dow Canada's directors are residents of the United States.

The complaint alleges that Dow Canada and Wyandotte have each dumped mercury into streams whose courses ultimately reach Lake Erie, thus contaminating and polluting that lake's waters, vegetation, fish, and wildlife, and that Dow America is jointly responsible for the acts of its foreign subsidiary. Assuming the State's

ability to prove these assertions, Ohio seeks a decree: (1) declaring the introduction of mercury into Lake Erie's tributaries a public nuisance; (2) perpetually enjoining these defendants from introducing mercury into Lake Erie or its tributaries; (3) requiring defendants either to remove the mercury from Lake Erie or to pay the costs of its removal into a fund to be administered by Ohio and used only for that purpose; (4) directing defendants to pay Ohio monetary damages for the harm done to Lake Erie, its fish, wildlife, and vegetation, and the citizens and inhabitants of Ohio.

Original jurisdiction is said to be conferred on this Court by Art. III of the Federal Constitution. Section 2, cl. 1, of that Article, provides: "The judicial Power shall extend . . . to Controversies . . . between a State and Citizens of another State . . . and between a State . . . and foreign . . . Citizens or Subjects." Section 2, cl. 2, provides: "In all Cases . . . in which a State shall be Party, the supreme Court shall have original Jurisdiction." Finally, 28 U. S. C. § 1251 (b) provides: "The Supreme Court shall have original but not exclusive jurisdiction of . . . (3) All actions or proceedings by a State against the citizens of another State or against aliens."

While we consider that Ohio's complaint does state a cause of action that falls within the compass of our original jurisdiction, we have concluded that this Court should nevertheless decline to exercise that jurisdiction.

## I

That we have jurisdiction seems clear enough.[1] Beyond doubt, the complaint on its face reveals the existence of a

---

[1] The matter is well treated in the Solicitor General's *amicus* brief, which satisfactorily deals with a number of considerations which we find it unnecessary to discuss in this opinion.

genuine "case or controversy" between one State and citizens of another, as well as a foreign subject. Diversity of citizenship is absolute. Nor is the nature of the cause of action asserted a bar to the exercise of our jurisdiction. While we have refused to entertain, for example, original actions designed to exact compliance with a State's penal laws, *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265 (1888), or that seek to embroil this tribunal in "political questions," *Mississippi* v. *Johnson*, 4 Wall. 475 (1867); *Georgia* v. *Stanton*, 6 Wall. 50 (1868), this Court has often adjudicated controversies between States and between a State and citizens of another State seeking to abate a nuisance that exists in one State yet produces noxious consequences in another. See *Missouri* v. *Illinois*, 180 U. S. 208 (1901) (complaint filed), 200 U. S. 496 (1906) (final judgment); *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230 (1907); *New York* v. *New Jersey*, 256 U. S. 296 (1921); *New Jersey* v. *New York City*, 283 U. S. 473 (1931). In short, precedent leads almost ineluctably to the conclusion that we are empowered to resolve this dispute in the first instance.[2]

Ordinarily, the foregoing would suffice to settle the issue presently under consideration: whether Ohio should be granted leave to file its complaint. For it is a time-

---

[2] While we possess jurisdiction over Dow America and Wyandotte simply on the basis of their citizenship, the problem with respect to Dow Canada is quite different with regard to two major issues: whether that foreign corporation has "contacts" of the proper sort sufficient to bring it personally before us, and whether service of process can lawfully be made upon Dow Canada. Were we to decide to entertain this complaint, however, it seems reasonably clear that the better course would be to reserve this aspect of the jurisdictional issue pending ascertainment of additional facts, rather than to resolve it now. Thus, for purposes of ruling on Ohio's motion for leave to file its complaint, we treat the question of jurisdiction over all three defendants as a unitary one.

honored maxim of the Anglo-American common-law tradition that a court possessed of jurisdiction generally must exercise it. *Cohens* v. *Virginia,* 6 Wheat. 264, 404 (1821). Nevertheless, although it may initially have been contemplated that this Court would always exercise its original jurisdiction when properly called upon to do so, it seems evident to us that changes in the American legal system and the development of American society have rendered untenable, as a practical matter, the view that this Court must stand willing to adjudicate all or most legal disputes that may arise between one State and a citizen or citizens of another, even though the dispute may be one over which this Court does have original jurisdiction.

As our social system has grown more complex, the States have increasingly become enmeshed in a multitude of disputes with persons living outside their borders. Consider, for example, the frequency with which States and nonresidents clash over the application of state laws concerning taxes, motor vehicles, decedents' estates, business torts, government contracts, and so forth. It would, indeed, be anomalous were this Court to be held out as a potential principal forum for settling such controversies. The simultaneous development of "long-arm jurisdiction" means, in most instances, that no necessity impels us to perform such a role. And the evolution of this Court's responsibilities in the American legal system has brought matters to a point where much would be sacrificed, and little gained, by our exercising original jurisdiction over issues bottomed on local law. This Court's paramount responsibilities to the national system lie almost without exception in the domain of federal law. As the impact on the social structure of federal common, statutory, and constitutional law has expanded, our attention has necessarily been drawn more and more to such matters. We have no claim

to special competence in dealing with the numerous conflicts between States and nonresident individuals that raise no serious issues of federal law.

This Court is, moreover, structured to perform as an appellate tribunal, ill-equipped for the task of factfinding and so forced, in original cases, awkwardly to play the role of factfinder without actually presiding over the introduction of evidence. Nor is the problem merely our lack of qualifications for many of these tasks potentially within the purview of our original jurisdiction; it is compounded by the fact that for every case in which we might be called upon to determine the facts and apply unfamiliar legal norms we would unavoidably be reducing the attention we could give to those matters of federal law and national import as to which we are the primary overseers.

Thus, we think it apparent that we must recognize "the need [for] the exercise of a sound discretion in order to protect this Court from an abuse of the opportunity to resort to its original jurisdiction in the enforcement by States of claims against citizens of other States." *Massachusetts* v. *Missouri*, 308 U. S. 1, 19 (1939), opinion of Chief Justice Hughes. See also *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, 464–465 (1945), and *id.*, at 469–471 (dissenting opinion).[3] We believe, however, that

---

[3] In our view the federal statute, 28 U. S. C. § 1251 (b) (3), providing that our original jurisdiction in cases such as these is merely concurrent with that of the federal district courts, reflects this same judgment. However, this particular case cannot be disposed of by transferring it to an appropriate federal district court since this statute by itself does not actually confer jurisdiction on those courts, see C. Wright, Federal Courts 502 (2d ed. 1970), and no other statutory jurisdictional basis exists. The fact that there is diversity of citizenship among the parties would not support district court jurisdiction under 28 U. S. C. § 1332 because that statute does not deal with cases in which a State is a party. Nor would federal question jurisdiction exist under 28 U. S. C. § 1331. So far as it

the focus of concern embodied in the above-quoted statement of Chief Justice Hughes should be somewhat refined. In our opinion, we may properly exercise such discretion, not simply to shield this Court from noisome, vexatious, or unfamiliar tasks, but also, and we believe principally, as a technique for promoting and furthering the assumptions and value choices that underlie the current role of this Court in the federal system. Protecting this Court *per se* is at best a secondary consideration. What gives rise to the necessity for recognizing such discretion is pre-eminently the diminished societal concern in our function as a court of original jurisdiction and the enhanced importance of our role as the final federal appellate court. A broader view of the scope and purposes of our discretion would inadequately take account of the general duty of courts to exercise that jurisdiction they possess.

Thus, at this stage we go no further than to hold that, as a general matter, we may decline to entertain a complaint brought by a State against the citizens of another State or country only where we can say with assurance that (1) declination of jurisdiction would not disserve any of the principal policies underlying the Article III jurisdictional grant and (2) the reasons of practical wisdom that persuade us that this Court is an inappropriate forum are consistent with the proposition that our discretion is legitimated by its use to keep this aspect of the Court's functions attuned to its other responsibilities.

## II

In applying this analysis to the facts here presented, we believe that the wiser course is to deny Ohio's motion for leave to file its complaint.

---

appears from the present record, an action such as this, if otherwise cognizable in federal district court, would have to be adjudicated under state law. *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938).

A

Two principles seem primarily to have underlain conferring upon this Court original jurisdiction over cases and controversies between a State and citizens of another State or country. The first was the belief that no State should be compelled to resort to the tribunals of other States for redress, since parochial factors might often lead to the appearance, if not the reality, of partiality to one's own. *Chisholm* v. *Georgia,* 2 Dall. 419, 475–476 (1793); *Wisconsin* v. *Pelican Ins. Co.,* 127 U. S., at 289. The second was that a State, needing an alternative forum, of necessity had to resort to this Court in order to obtain a tribunal competent to exercise jurisdiction over the acts of nonresidents of the aggrieved State.

Neither of these policies is, we think, implicated in this lawsuit. The courts of Ohio, under modern principles of the scope of subject matter and *in personam* jurisdiction, have a claim as compelling as any that can be made out for this Court to exercise jurisdiction to adjudicate the instant controversy, and they would decide it under the same common law of nuisance upon which our determination would have to rest. In essence, the State has charged Dow Canada and Wyandotte with the commission of acts, albeit beyond Ohio's territorial boundaries, that have produced and, it is said, continue to produce disastrous effects within Ohio's own domain. While this Court, and doubtless Canadian courts, if called upon to assess the validity of any decree rendered against either Dow Canada or Wyandotte, would be alert to ascertain whether the judgment rested upon an even-handed application of justice, it is unlikely that we would totally deny Ohio's competence to act if the allegations made here are proved true. See, *e. g., International Shoe Co.* v. *Washington,* 326 U. S. 310 (1945);

*United States* v. *Aluminum Co. of America,* 148 F. 2d 416 (CA2 1945); ALI, Restatement of the Foreign Relations Law of the United States 2d, § 18. And while we cannot speak for Canadian courts, we have been given no reason to believe they would be less receptive to enforcing a decree rendered by Ohio courts than one issued by this Court. Thus, we do not believe exercising our discretion to refuse to entertain this complaint would undermine any of the purposes for which Ohio was given the authority to bring it here.

## B

Our reasons for thinking that, as a practical matter, it would be inappropriate for this Court to attempt to adjudicate the issues Ohio seeks to present are several. History reveals that the course of this Court's prior efforts to settle disputes regarding interstate air and water pollution has been anything but smooth. In *Missouri* v. *Illinois,* 200 U. S. 496, 520–522 (1906), Justice Holmes was at pains to underscore the great difficulty that the Court faced in attempting to pronounce a suitable general rule of law to govern such controversies. The solution finally grasped was to saddle the party seeking relief with an unusually high standard of proof and the Court with the duty of applying only legal principles "which [it] is prepared deliberately to maintain against all considerations on the other side," *id.,* at 521, an accommodation which, in cases of this kind, the Court has found necessary to maintain ever since.[4] See, *e. g., New*

---

[4] Justice Holmes' analysis appears to rest, in part, on the fact that in the case before him the conduct complained of was the act of a sovereign State. However, we see no reason why the determination to impose a high standard of proof would not be equally compelling in a case such as the one before us. Arguably, the necessity for applying virtually unexceptionable legal principles does not obtain where conduct never previously subjected to state law scrutiny is involved, but this is not the case here. See text, *infra.*

*York* v. *New Jersey*, 256 U. S., at 309. Justice Clarke's closing plea in *New York* v. *New Jersey, id.*, at 313, strikingly illustrates the sense of futility that has accompanied this Court's attempts to treat with the complex technical and political matters that inhere in all disputes of the kind at hand:

> "We cannot withhold the suggestion, inspired by the consideration of this case, that the grave problem of sewage disposal presented by the large and growing populations living on the shores of New York Bay is one more likely to be wisely solved by cooperative study and by conference and mutual concession on the part of representatives of the States so vitally interested in it than by proceedings in any court however constituted."

The difficulties that ordinarily beset such cases are severely compounded by the particular setting in which this controversy has reached us. For example, the parties have informed us, without contradiction, that a number of official bodies are already actively involved in regulating the conduct complained of here. A Michigan circuit court has enjoined Wyandotte from operating its mercury cell process without judicial authorization. The company is, moreover, currently utilizing a recycling process specifically approved by the Michigan Water Resources Commission and remains subject to the continued scrutiny of that agency. Dow Canada reports monthly to the Ontario Water Resources Commission on its compliance with the commission's order prohibiting the company from passing any mercury into the environment.

Additionally, Ohio and Michigan are both participants in the Lake Erie Enforcement Conference, convened a year ago by the Secretary of the Interior pursuant to the Federal Water Pollution Control Act, 62 Stat. 1155,

as amended. The Conference is studying all forms and sources of pollution, including mercury, infecting Lake Erie. The purpose of this Conference is to provide a basis for concerted remedial action by the States or, if progress in that regard is not rapidly made, for corrective proceedings initiated by the Federal Government. 33 U. S. C. § 466g (1964 ed. and Supp. V). And the International Joint Commission, established by the Boundary Waters Treaty of 1909 between the United States and Canada, 36 Stat. 2448, issued on January 14, 1971, a comprehensive report, the culmination of a six-year study carried out at the request of the contracting parties, concerning the contamination of Lake Erie. That document makes specific recommendations for joint programs to abate these environmental hazards and recommends that the IJC be given authority to supervise and coordinate this effort.

In view of all this, granting Ohio's motion for leave to file would, in effect, commit this Court's resources to the task of trying to settle a small piece of a much larger problem that many competent adjudicatory and conciliatory bodies are actively grappling with on a more practical basis.

The nature of the case Ohio brings here is equally disconcerting. It can fairly be said that what is in dispute is not so much the law as the facts. And the factfinding process we are asked to undertake is, to say the least, formidable. We already know, just from what has been placed before us on this motion, that Lake Erie suffers from several sources of pollution other than mercury; that the scientific conclusion that mercury is a serious water pollutant is a novel one; that whether and to what extent the existence of mercury in natural waters can safely or reasonably be tolerated is a question for which there is presently no firm answer; and that virtually no published research is available describing

how one might extract mercury that is in fact contaminating water. Indeed, Ohio is raising factual questions that are essentially ones of first impression to the scientists. The notion that appellate judges, even with the assistance of a most competent Special Master, might appropriately undertake at this time to unravel these complexities is, to say the least, unrealistic. Nor would it suffice to impose on Ohio an unusually high standard of proof. That might serve to mitigate our personal difficulties in seeking a just result that comports with sound judicial administration, but would not lessen the complexity of the task of preparing responsibly to exercise our judgment, or the serious drain on the resources of this Court it would entail. Other factual complexities abound. For example, the Department of the Interior has stated that eight American companies are discharging, or have discharged, mercury into Lake Erie or its tributaries. We would, then, need to assess the business practices and relative culpability of each to frame appropriate relief as to the one now before us.

Finally, in what has been said it is vitally important to stress that we are not called upon by this lawsuit to resolve difficult or important problems of federal law and that nothing in Ohio's complaint distinguishes it from any one of a host of such actions that might, with equal justification, be commenced in this Court. Thus, entertaining this complaint not only would fail to serve those responsibilities we are principally charged with, but could well pave the way for putting this Court into a quandary whereby we must opt either to pick and choose arbitrarily among similarly situated litigants or to devote truly enormous portions of our energies to such matters.

To sum up, this Court has found even the simplest sort of interstate pollution case an extremely awkward vehicle to manage. And this case is an extraordinarily complex one both because of the novel scientific issues of

fact inherent in it and the multiplicity of governmental agencies already involved. Its successful resolution would require primarily skills of factfinding, conciliation, detailed coordination with—and perhaps not infrequent deference to—other adjudicatory bodies, and close supervision of the technical performance of local industries. We have no claim to such expertise or reason to believe that, were we to adjudicate this case, and others like it, we would not have to reduce drastically our attention to those controversies for which this Court is a proper and necessary forum. Such a serious intrusion on society's interest in our most deliberate and considerate performance of our paramount role as the supreme federal appellate court could, in our view, be justified only by the strictest necessity, an element which is evidently totally lacking in this instance.

### III

What has been said here cannot, of course, be taken as denigrating in the slightest the public importance of the underlying problem Ohio would have us tackle. Reversing the increasing contamination of our environment is manifestly a matter of fundamental import and utmost urgency. What is dealt with above are only considerations respecting the appropriate role this Court can assume in efforts to eradicate such environmental blights. We mean only to suggest that our competence is necessarily limited, not that our concern should be kept within narrow bounds.

Ohio's motion for leave to file its complaint is denied without prejudice to its right to commence other appropriate judicial proceedings.

*It is so ordered.*

Mr. Justice Douglas, dissenting.

The complaint in this case presents basically a classic type of case congenial to our original jurisdiction. It is

to abate a public nuisance. Such was the claim of Georgia against a Tennessee company which was discharging noxious gas across the border into Georgia. *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230. The Court said:

> "It is a fair and reasonable demand on the part of a sovereign that the air over its territory should not be polluted on a great scale by sulphurous acid gas, that the forests on its mountains, be they better or worse, and whatever domestic destruction they have suffered, should not be further destroyed or threatened by the act of persons beyond its control, that the crops and orchards on its hills should not be endangered from the same source." *Id.,* at 238.

Dumping of sewage in an interstate stream, *Missouri* v. *Illinois,* 200 U. S. 496, or towing garbage to sea only to have the tides carry it to a State's beaches, *New Jersey* v. *New York City,* 283 U. S. 473, have presented analogous situations which the Court has entertained in suits invoking our original jurisdiction. The pollution of Lake Erie or its tributaries by the discharge of mercury or compounds thereof, if proved, certainly creates a public nuisance of a seriousness and magnitude which a State by our historic standards may prosecute or pursue as *parens patriae.*

The suit is not precluded by the Boundary Waters Treaty of 1909, 36 Stat. 2448. Article IV provides that the "boundary waters . . . shall not be polluted on either side to the injury of health or property on the other." But there is no machinery for direct enforcement of Art. IV.

Article VIII empowers the International Joint Commission to "pass upon all cases involving the use or obstruction or diversion of the waters with respect to which under Articles III and IV . . . the approval of this Commission is required." Those Articles specifically describe the type of projects for which approval is required. For

example, Art. IV states that the "[p]arties . . . will not permit the construction or maintenance . . . of any remedial or protective works or any dams or other obstructions . . . the effect of which is to raise the natural level of waters on the other side of the boundary unless . . . approved by the . . . Commission." Significantly, the proscription of pollution, which immediately follows this provision in Art. IV, does not mention approval or action by the International Joint Commission.

Article X does vest the Commission with power to render binding decisions on matters referred by consent of both parties. But Art. X states that any joint reference "on the part of the United States . . . will be by and with the advice and consent of the Senate, and on the part of His Majesty's Government with the consent of the Governor General in Council."

In other words, so far as pollution is concerned, the Treaty contains no provision for binding arbitration. Thus, it does not evince a purpose on the part of the national governments of the United States and Canada to exclude their States and Provinces from seeking other remedies for water pollution. Indeed, Congress in later addressing itself to water pollution in the Federal Water Pollution Control Act, 33 U. S. C. § 1151 (1970 ed.), said in § 1 (c):

> "Nothing in this chapter shall be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (*including boundary waters*) of such States." (Emphasis added.)

This litigation, as it unfolds, will, of course, implicate much federal law. The case will deal with an important portion of the federal domain—the navigable streams and the navigable inland waters which are under the sovereignty of the Federal Government. It has been clear

since *Pollard's Lessee* v. *Hagan,* 3 How. 212, decided in 1845, that navigable waters were subject to federal control. That paramount federal dominion extends into the oceans beyond low tide. *United States* v. *California,* 332 U. S. 19.

Congress has enacted numerous laws reaching that domain. One of the most pervasive is the Rivers and Harbors Act of 1899, 30 Stat. 1121, as amended, 33 U. S. C. § 403, which was before us in *United States* v. *Republic Steel Corp.,* 362 U. S. 482. In that case we read § 13 of the 1899 Act, 33 U. S. C. § 407, which forbids discharge of "any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state" as including particles in suspension. *Id.,* at 490.

In the 1930's fish and wildlife legislation was enacted granting the Secretary of the Interior various heads of jurisdiction over the effects on fish and wildlife of "domestic sewage, mine, petroleum, and industrial wastes, erosion silt, and other polluting substances." See, *e. g.,* 16 U. S. C. § 665. Among other things, the Secretary of the Interior through the Fish and Wildlife Service gave advice to the Corps of Engineers as respects the effects which proposed dredging or filling of estuaries would have on fish or wildlife.[1]

Since that time other changes have been made in the design of the federal system of water control. The Federal Water Pollution Control Act, as amended, 33 U. S. C. § 1151 (1970 ed.), gives broad powers to the Secretary to take action respecting water pollution on complaints of States, and other procedures to secure federal abatement of the pollution. *Ibid.* The National

---

[1] See Hearings before the Subcommittee on Fisheries and Wildlife Conservation of the House Committee on Merchant Marine and Fisheries, Serial No. 90–3, p. 32 *et seq.*

Environmental Policy Act of 1969, 83 Stat. 852, 42 U. S. C. § 4331 (1964 ed., Supp. V), gives elaborate ecological directions to federal agencies and supplies procedures for their enforcement.

On December 23, 1970, the President issued an Executive Order [2] which correlates the duties of the Corps of Engineers and the Administrator of the new Environmental Protection Agency under the foregoing statutes. Under that Executive Order the Corps in order "to regulate the discharge of pollutants and other refuse matter into the navigable waters of the United States or their tributaries" is directed after consultation with the Administrator to amend its regulations concerning issuance of permits. While the Corps is responsible for granting or denying permits, § 2 (a)(2), it *must* accept the findings of the Administrator respecting "water quality standards," § 2(a)(2)(A). On December 31, 1970, the Corps gave notice of its new proposed rules to govern discharges or deposits into navigable waters.[3]

Yet the federal scheme is not pre-emptive of state action. Section 1 (b) of the Water Pollution Control Act declares that the policy of Congress is "to recognize, preserve, and protect the primary responsibilities and rights of the States in preventing and controlling water pollution." 33 U. S. C. § 1151 (b) (1970 ed.). Section 10 provides that except where the Attorney General has actually obtained a court order of pollution abatement on behalf of the United States, "State and interstate action to abate pollution of . . . navigable waters . . . shall not . . . be displaced by Federal enforcement action." § 10 (b), 33 U. S. C. § 1160 (b) (1970 ed.).

The new Environmental Quality Improvement Act of 1970, 84 Stat. 114, 42 U. S. C. § 4371 (1970 ed.),

---

[2] Exec. Order No. 11574, 35 Fed. Reg. 19627.

[3] 35 Fed. Reg. 20005. And see 36 Fed. Reg. 983 concerning its proposed policy, practice, and procedure in that regard.

while stating the general policy of Congress in protecting the environment, also states: "The primary responsibility for implementing this policy rests with State and local governments." 42 U. S. C. § 4371 (b)(2) (1970 ed.).

There is much complaint that in spite of the arsenal of federal power little is being done.[4] That, of course, is not our problem. But it is our concern that state action is not pre-empted by federal law. Under existing federal law, the States do indeed have primary responsibility for setting water quality standards; the federal agency only sets water quality standards for a State if the State defaults. 33 U. S. C. § 1160 (c) (1970 ed.).

There is not a word in federal law that bars state action. If, however, defendants had a permit from the Corps to discharge mercury into federal waters, the question would be vastly different. But they do not, and so far as appears they are not under any federal process and are not parties to any federal proceedings. In light of the history of water pollution control efforts in this country it cannot be denied that a vast residual authority rests in the States. And there is no better established remedy in state law than authority to abate a nuisance.[5]

Much is made of the burdens and perplexities of these original actions. Some are complex, notably those involving water rights.

---

[4] See Polikoff, The Interlake Affair, Wash. Monthly, Vol. 3, No. 1, p. 7 (Mar. 1971).

[5] 2 W. Blackstone, Commentaries *218 (Cooley 4th ed. 1899):

"[I]t is a nuisance to stop or divert water that used to run to another's meadow or mill; to corrupt or poison a water-course, by erecting a dyehouse or a lime-pit for the use of trade, in the upper part of the stream; or in short to do any act therein that in its consequences must necessarily tend to the prejudice of one's neighbour. So closely does the law of England enforce that excellent rule of gospel morality, of 'doing to others as we would they should do unto ourselves.'"

The drainage of Lake Michigan with the attendant lowering of water levels, affecting Canadian as well as United States interests, came to us in an original suit in which the Hon. Charles E. Hughes was Special Master. This Court entered a decree, *Wisconsin* v. *Illinois*, 278 U. S. 367, and has since that time entered supplementary decrees.[6]

The apportionment of the waters of the Colorado between Arizona and California was a massive undertaking entailing a searching analysis by the Special Master, the Hon. Simon H. Rifkind. Our decision was based on the record made by him and on exceptions to his Report. *Arizona* v. *California*, 373 U. S. 546.

The apportionment of the waters of the North Platte River among Colorado, Wyoming, and Nebraska came to us in an original action in which we named as Special Master, Hon. Michael J. Doherty. We entered a complicated decree, which dissenters viewed with alarm, *Nebraska* v. *Wyoming*, 325 U. S. 589, but which has not demanded even an hour of the Court's time during the 26 years since it was entered.

If in these original actions we sat with a jury, as the Court once did,[7] there would be powerful arguments for abstention in many cases. But the practice has been to appoint a Special Master which we certainly would do in this case. We could also appoint—or authorize the Special Master to retain—a panel of scientific advisers. The problems in this case are simple compared with those in the water cases discussed above. It is now known that metallic mercury deposited in water is often transformed into a dangerous chemical. This lawsuit would determine primarily the extent, if any, to which the defendants are contributing to that contamination at the present

---

[6] 281 U. S. 179, 696; 289 U. S. 395; 309 U. S. 569; 311 U. S. 107; 313 U. S. 547; 388 U. S. 426.

[7] *Georgia* v. *Brailsford*, 3 Dall. 1.

time. It would determine, secondarily, the remedies within reach—the importance of mercury in the particular manufacturing processes, the alternative processes available, the need for a remedy against a specified polluter as contrasted to a basin-wide regulation, and the like.

The problem, though clothed in chemical secrecies, can be exposed by the experts. It would indeed be one of the simplest problems yet posed in the category of cases under the head of our original jurisdiction.

The Department of Justice in a detailed brief tells us there are no barriers in federal law to our assumption of jurisdiction.[8] I can think of no case of more transcending public importance than this one.

---

[8] The case is therefore not an appropriate one for application of the teaching of *Massachusetts* v. *Mellon*, 262 U. S. 447, 485–486, that "[w]hile the State, under some circumstances, may sue (as *parens patriae*) for the protection of its citizens (*Missouri* v. *Illinois*, 180 U. S. 208, 241), it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae*, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status."