Glen J. TRAVIS et al., Appellants,

v.

ANTHES IMPERIAL LIMITED et al.,
Appellees.

No. 71–1587.

United States Court of Appeals,
Eighth Circuit.

Submitted May 10, 1972.

Decided Jan. 12, 1973.

John J. Cole, St. Louis, Mo., for appellants.

Robert F. Dobbin, New York City, and Thomas E. Deacy, Jr., Kansas City, Mo., for appellees.

Before MATTHES, Chief Judge, and LAY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The defendants have been charged in a private civil action with defrauding the plaintiffs in violation of § 10(b) of the Securities Exchange Act of 1934,[1] Rule 10b–5 [2] and the common law. The District Court, 331 F.Supp. 797, dismissed the action before trial for lack of jurisdiction over the subject matter and for improper venue. We reverse.

## STATEMENT OF FACTS [3]

The plaintiffs are Glen J. Travis and his family of St. Louis, Missouri, and the St. Louis Union Trust Company (the corporate trustee of a Travis-family trust). The St. Louis Union Trust Company is a Missouri corporation with its principal place of business in Missouri.

The corporate defendants—Anthes Imperial Limited ("Anthes"), Molson Industries Limited ("Molson") and Dominion Securities Limited ("Dominion") —are Canadian corporations. Each corporation owns subsidiaries and conducts business in the United States, but the stock of these parent corporations has never been registered with the Securities Exchange Commission or listed on any American stock exchange. The twenty-three individual defendants were at the relevant time controlling shareholders, officers and/or directors of Anthes and/or Molson. Twenty-one of these individual defendants are Canadian residents; two reside in the United States in states other than Missouri.

Anthes has two classes of common stock, A and B, which were at the relevant time freely exchangeable for each other. In August, 1966, the plaintiffs, in a tax-free reorganization, exchanged their stock in a Travis-family corpora-

---

1. "Sec. 10. It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
 \* \* \* \* \*
 "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."
 15 U.S.C. § 78j(b).

2. "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 "(1) to employ any device, scheme, or artifice to defraud,
 "(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 "(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."
 17 C.F.R. § 240.10b–5.

3. We have carefully reviewed the complaint and the affidavits submitted by all parties in developing a statement of facts. Where these documents reveal a dispute as to a material fact, we have accepted the plaintiffs' allegations as true and have given them the benefit of inferences. See generally, United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Zunamon v. Brown, 418 F.2d 883, 886 (8th Cir. 1969). In doing so, we intimate no opinion on the merits. See, Sup't of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). We add that:
 " \* \* \* if a trial should disclose that the allegedly fraudulent acts of any of the defendants within the United States were non-existent or so minimal as not to be material, the principles announced in this opinion should be applied to the proven facts \* \* \*."
 Leasco Data Processing Equipment Corporation v. Isidore Kerman, 468 F.2d 1326 at 1330 (2nd Cir. 1972).

tion, Multiplex Company, for shares of Anthes Class A common stock. As of May 25, 1968, Anthes had 2,159,158 shares of common stock outstanding. Approximately 200,640 of these shares were owned by about one hundred stockholders who resided in the United States. The plaintiffs owned nearly eighty per cent of these shares.

On June 28, 1968, a tender offer was made by Molson to Anthes Canadian stockholders for the purpose of merging Anthes into Molson. It provided for an exchange of Anthes common stock in return for Molson Class A and Class C stock and cash. Anthes shareholders residing in the United States were excluded from the offer. By September 30, 1968, Molson had acquired over ninety per cent of Anthes outstanding common stock.

The plaintiffs allege that the defendants, through various communications transmitted by mail and instrumentalities of interstate commerce and directed to the plaintiffs in the United States, led the plaintiffs to believe that if they retained their stock until after the expiration of the tender offer to the Canadian shareholders, a separate offer would be made to them and other United States shareholders. The plaintiffs also allege that the defendants did not intend to make the offer. The promised offer, according to the plaintiffs, was to be designed to provide an after-tax result for American shareholders substantially equivalent to that received by the Canadian shareholders. The plaintiffs allege that they relied on the defendants' promises and retained their stock. The plaintiffs further allege that the defendants excluded them from the tender offer with the purpose of denying them an opportunity to participate equally with Anthes Canadian shareholders in the benefits of the merger. This exclusion is alleged to have constituted self dealing because after the merger, some of the individual defendants obtained increased voting control, improved dividends and higher salaries and benefits.[4]

On June 26, 1969, a Molson vice president, telephoned plaintiffs' counsel and told him that a separate offer would not be made to the plaintiffs, but that plaintiffs could either exchange Anthes stock for Class A Molson stock plus cash at the tender offer exchange rate, or receive the cash equivalent thereof determined by the prevailing market value of Molson Class A stock. The Molson vice president allegedly warned that unless the plaintiffs agreed to sell their Anthes stock to Molson on these terms by the end of the following day, Molson would withdraw market support for the plaintiffs' stock.[5] The plaintiffs acceded and sold their Anthes stock to Molson for $40.40 (Canadian) in cash per share. This price was allegedly substantially less than the plaintiffs would have re-

---

4. The defendants swear that they neither promised to make a separate offer to the plaintiffs nor urged the plaintiffs to retain their Anthes stock. They contend that the alleged offer was solely the product of the plaintiffs' one-sided efforts to obtain preferential treatment and payment of their capital gains taxes.

The defendants also deny that the tender offer was limited to the Canadian shareholders for the purposes alleged by the plaintiffs. They swear that the tender offer was restricted to avoid the necessity of Molson having to register its shares with the United States Securities Exchange Commission. They point out that inherent in such registration are expenses and delay which, in the business judgment of Molson's management, could not be justified.

5. Kenneth Gates, Molson, Vice President-Law, made this telephone call from Toronto, Canada, to John J. Cole, Travis's counsel in St. Louis, Missouri. Gates swears that the same offer had been conveyed to Travis's Canadian counsel earlier in June. Cole avers that Gates told him that the plaintiffs must sell their "stock to Molson no later than the close of business the next day, June 27, 1969, or thereafter it would be a different ball-game." Gates further swore that:

" * * * Mr. Cole was advised by me, in effect, that once the tender offer expired [June 27, 1969] Molson would neither be nor feel in any way bound to purchase the Anthes common shares owned by plaintiffs or by anyone else, * * *."

ceived if they had sold their stock within thirty to sixty days after they first learned of the tender offer to the Canadian shareholders of Anthes when an open market for Anthes common stock still existed.

Thereafter, the plaintiffs instituted a class action for damages. The first amended complaint—the one that we deal with here—had two counts. Count I purported to state two separate claims: (1) misrepresentations and nondisclosures in violation of § 10(b) and Rule 10b–5, and (2) self-dealing in violation of § 10(b) and Rule 10b–5. Count II purported to state common law claims for fraud and breach of fiduciary duties.

The defendants moved to dismiss the complaint on the following grounds: [6] (1) lack of jurisdiction over the subject matter, (2) improper venue, (3) lack of personal jurisdiction over the defendants, (4) insufficiency of service of process, and (5) failure to state a claim upon which relief can be granted.

The trial court considered the defendants' motions on the basis of the complaint, briefs, affidavits and oral argument.

The trial court held that subject matter jurisdiction was lacking under § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, because: the plaintiffs were not sellers of securities within the meaning of § 10(b) and the defendants' fraudulent conduct did not induce the sale of the securities; and the transaction was a Canadian one in Canadian securities and circumstances were not present which permitted an extraterritorial application of the Act. Moreover, it held that the defendants' contacts and acts within the United States were not such necessary and substantial acts as to give the court jurisdiction.

The trial court also held that venue was not properly laid in the Eastern District of Missouri under either the special venue provisions of the Securities Exchange Act, 15 U.S.C. § 78aa, or the general venue statute, 28 U.S.C. § 1391. It stated that no acts or transactions constituting the violation had occurred in the district because "statements and negotiations with respect to the sale of plaintiffs' shares were conducted primarily at plaintiffs' initiative" and those acts which did take place in the district were not the acts alleged to have been fraudulent.

The trial court did not consider the defendants' contentions that the court lacked personal jurisdiction over the defendants, that the service of process on the defendants was insufficient, and that the complaint failed to state a claim upon which relief can be granted. The first of these issues was fully briefed and argued to this Court.

The plaintiffs appeal from the trial court's dismissal of their complaint.

## SUBJECT MATTER JURISDICTION—COUNT I

### Claim 1—The Purchaser-Seller Requirement

Section 27 of the Securities Exchange Act of 1934 gives federal District Courts jurisdiction over suits brought to enforce liability for actions in violation of the Act or the rules promulgated under it.[7] Section 10(b) and Rule 10b–5

---

6. The plaintiffs made the following motions: (a) to compel discovery (b) to proceed as a class action, and (c) to amend their first amended complaint to include an allegation that the defendants had violated the Williams Act, 15 U.S.C. § 78n (e). The trial court did not rule on the plaintiffs first two motions, and it denied the third. The plaintiffs concede in their brief that "if this court finds that the plaintiffs were 'sellers' within the meaning of the 1934 Act or 'forced sellers' * * * then this point [the Williams Act question] would be moot." We agree.

7. "The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter [the Securities Exchange Act of 1934] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. * * *"

15 U.S.C. § 78aa.

require that the acts prohibited must be "in connection with the purchase or sale of any security."

We have followed other courts in holding that the quoted phrase generally limits standing to those who are defrauded "purchasers" or "sellers" of securities, and to limit the coverage of the statute and rule to fraudulent practices in connection with the "purchase" or "sale" of securities.[8]

■ It is unnecessary to relax the standing requirement here because the plantiffs did in fact sell securities to the defendants.[9]

■ It is equally unnecessary to expand the coverage of the statute and the rule to meet the facts of this case because the defendants' alleged fraud was clearly connected with the sale of securities.[10]

The defendants' misrepresentations allegedly induced the plaintiffs to believe that Molson would make a tax-free exchange or equivalent offer for their stock after the tender offer to Anthes Canadian shareholders had expired. Moreover, the defendants encouraged the plaintiffs to hold their Anthes stock until the defendants controlled the market for that stock and could dictate the price at which a sale would be made. Absent defendants' encouragement, the plaintiffs would have sold their stock earlier when a market for Anthes stock existed and the price was higher. The fact that the sale took place at a time when the plaintiffs were aware of all of the facts, including the defendants' misrepresentations, is not fatal to the plaintiffs' claim. Section 10(b) and Rule 10b–5 require only that the fraud be "in connection with the purchase or sale of any security," and, here, the connection is direct and obvious. As Judge Bonsal stated in Stockwell v. Reynolds & Co., 252 F.Supp. 215, 219 (S.D.N.Y.1965):

> "The words 'in connection with the purchase or sale of any security' * * * do not require that the purchase or sale immediately follow the alleged fraud. * * * If plaintiffs indeed wished to sell their * * * shares * * * and were induced to defer the sale by the fraudulent representations of the defendants, with the result that they ultimately sold at a greater loss, it follows * * * that the fraud was in connection with the

---

8. See generally, Comment, SEC Rule 10b–5—"In Connection With the Purchase or Sale of Any Security" Restriction: Need for Analytical Precision, 5 Colum.J.L. & Soc.Prob. 27 (1969).

9. The Securities Exchange Commission, in an amicus brief, has asked us to abandon the "purchaser or seller" requirement. We decline to do so here, but emphasize that the Securities Exchange Act of 1934 is remedial legislation which should be construed broadly to effectuate its purpose, Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), and that "10(b) must be read flexibly, not technically and restrictively." Sup't of Insurance v. Bankers Life & Cas. Co., *supra,* 404 U.S. at 12, 92 S.Ct. at 169.

10. In City National Bank of Fort Smith, Ark. v. Vanderboom, 422 F.2d 221, 229–232 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970), we laid down a two-step test for determining whether misrepresentations and nondisclosures fall within the statutory coverage of the "in connection with the pur-

chase or sale of any security" clauses of § 10(b) and Rule 10b–5.

"* * * (1) With regard to misrepresentations, the question is whether a reasonable investor, in light of the facts existing at the time of the misrepresentation and in the exercise of due care, would have been entitled to rely upon the misrepresentation. With regard to nondisclosures, the issue becomes whether a reasonable investor, in light of the facts existing at the time of the nondisclosure and in the exercise of due care, would have been entitled to receive full disclosure from the party charged and would have acted differently had the alleged nondisclosure not occurred. (2) If the plaintiff satisfied this 'in connection with' step, it then becomes necessary to determine whether the defendant's misrepresentation or nondisclosure was made [either] with scienter or from a lack of due diligence."

*Id.* at 230.

The facts alleged here bring this case within these tests.

sale of securities as that term is used in Section 10(b) and Rule 10b–5. * * *

* * * * * *

" * * * Considering the purposes underlying the Securities Exchange Act and Section 10(b) and Rule 10b–5, which are to protect investors from fraud, it follows that a seller is injured as much when he suffers a loss on the sale of securities which he has been fraudulently induced to retain as when he is fraudulently induced to sell them. * * *"

To deny standing to plaintiffs would defeat the purpose of both § 10(b) and Rule 10b–5, which were designed to protect investors from deceptive schemes no matter how ingenious. See generally, A. T. Brod. & Co. v. Perlow, 375 F.2d 393, 397 (2nd Cir. 1967).

The plaintiffs can also be accorded standing under the "forced seller" doctrine enunciated in Vine v. Beneficial Finance Company, 374 F.2d 627 (2nd Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). See also, Dudley v. Southeastern Factor and Finance Corp., 446 F.2d 303 (5th Cir.), cert. denied sub nom. McDaniel v. Dudley, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed. 2d 101 (1971); Coffee v. Permian Corporation, 434 F.2d 383 (5th Cir. 1970); Crane Company v. Westinghouse Air Brake Company, 419 F.2d 787 (2nd Cir. 1969), cert. denied, 400 U.S. 822, 91 S. Ct. 41, 27 L.Ed.2d 50 (1970). In Vine, the appellant retained his stock in a target corporation after ninety-five per cent of the outstanding stock had been acquired through a tainted tender offer by the appellee, a second corporation. The appellee, without the approval of the appellant, merged the target corporation into itself under a short-form merger statute. This left the appellant with stock in a nonexistent corporation and no market for his stock, except by exercising his statutory appraisal rights or by accepting the appellee's offer to purchase his shares. The Court observed that in either case:

" * * * Since, in order to realize any value for his stock, appellant must exchange the shares for money from appellee, as a practical matter appellant must eventually become a party to a 'sale,' as that term has always been used. * * * It is true that appellant still has his stock; if he turned it in for the price of $3.29 a share, it would be clearer that appellant is a seller. Assuming that this would not otherwise affect his right to sue under the Act and the Rule, requiring him to do so as a condition to suit seems a needless formality."

Vine v. Beneficial Finance Company, supra, 374 F.2d at 634.

Here, Molson had acquired over ninety per cent of the outstanding common stock of Anthes and had publicly announced that the two companies were merged and were operating as a single company[11] before the plaintiffs learned that the defendants did not intend to make a favorable offer for their stock. An open market for Anthes stock had

11. In a letter of October 4, 1968, to the former shareholders of Anthes who had participated in the tender offer, the President and Chairman of the Board of Molson stated:

"The combination of Anthes Imperial Limited and Molson Breweries Limited (now Molson Industries Limited) has created one of the largest Canadian-owned companies on the Canadian industrial scene. It has also resulted in the creation of a company with proven capable management and strong financial resources.

* * * * *

"As the result of the merger the Company manufactures an important range of other products which are produced and marketed in Canada, the United States, Mexico and Europe. The markets for these products include construction, petroleum marketing equipment, industrial, consumer, agriculture and office equipment and supplies. While these operations are primarily engaged in secondary manufacturing of durable products, other products, such as business forms, and services, such as equipment rentals, are marketed as well."

ceased to exist, and the only possibility for sale of plaintiffs' stock was to Molson on Molson's terms.[12] These facts fit the *Vine* pattern with two exceptions: (1) In *Vine*, the merger was a fait accompli. Here, technical details remain to be completed. (2) In *Vine*, a present legal requirement to sell existed. Here, the compulsion to sell was a practical one. Neither exception is crucial. The controlling considerations are the same as in *Vine*. A de facto merger had taken place; there was only one purchaser for Anthes stock; and Molson was able to fix the price at which such stock would be purchased. But see, Greenstein v. Paul, 400 F.2d 580 (2nd Cir. 1968).[13]

■ Defendants Molson and Anthes argue that it is improper to call the plaintiffs "forced sellers" because they gave the plaintiffs an opportunity to exchange their Anthes stock for Molson Class A stock and cash. We find this contention to be without merit. In either case, the plaintiffs were forced to sell their Anthes stock to Molson and the form of consideration (Molson stock and cash rather than cash alone) cannot change this fact. See generally, Mader v. Armel, 402 F.2d 158 (6th Cir. 1968), cert. denied, sub nom Young v. Mader, 394 U.S. 930, 89 S.Ct. 1188, 22 L.Ed.2d 459 (1969).

*The Necessity for Significant Conduct in the United States*

The District Court held that it was without jurisdiction over the subject matter because the transaction was an essentially Canadian one requiring extraterritorial application of the Securities and Exchange Act. The court stated that such application was proper only (1) where necessary to protect domestic investors who have purchased foreign securities on American exchanges, or (2) where necessary to protect the domestic securities market from the effects of improper foreign transactions in American securities. And that in either event, it was also necessary that there be substantial acts with respect to the alleged violations in the United States.[14]

12. The circumstances faced by the other Anthes U.S. shareholders are even more compelling. On October 14, 1969, a Molson Vice President and Secretary, J. B. Jolley, sent a form letter to the remaining shareholders of Anthes offering to purchase their Anthes stock. The price offered was $25.00 per share. Not all shareholders accepted this offer. In the form letter, Molson revealed that it owned in excess of ninety-nine per cent of the outstanding common stock of Anthes and that Anthes Class B common stock was delisted from the trading list of the Toronto Stock Exchange on January 10, 1969, and that a similar delisting of Anthes Class A common shares would be effected on October 31, 1969.

13. Greenstein v. Paul, 400 F.2d 580 (2nd Cir. 1968), is distinguishable on its facts from the instant case. In *Greenstein*, the proposed merger had been temporarily abandoned, whereas here, a de facto merger has been effected and only mechanical details remain to be completed for a formal merger.

14. The District Court reached this conclusion from its reading of Schoenbaum v. Firstbrook, 405 F.2d 200 (2nd Cir. 1968), affirmed in part, reversed in part on other grounds, 405 F.2d 215 (en banc), cert. denied, sub nom Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). We are not persuaded that the Second Circuit intended, in *Schoenbaum*, to set forth the exclusive circumstances in which extraterritorial application of the Act is proper. The facts in *Schoenbaum* required only that the court decide whether the Securities Exchange Act of 1934 applied to a foreign transaction in foreign securities which were registered and listed on an American exchange. The court was not required to decide whether the Act would apply to a foreign transaction in foreign securities which had never been registered or listed on an American exchange when a number of significant elements of the fraudulent scheme took place in the United States.

Moreover, *Schoenbaum* was not a limiting decision as the Court decided that subject matter jurisdiction was present. Our view of *Schoenbaum* is supported by Leasco Data Processing Equipment Corporation v. Isidore Kerman, *supra*. The *Leasco* Court said:

" * * * *Schoenbaum* [Schoenbaum v. Firstbrook, 405 F.2d 200 (2nd Cir.

We feel that it erred in holding that the transaction, when considered as a whole, was essentially a Canadian one requiring an extraterritorial application of the Act. Moreover, it erred in stating that the Act only applied when foreign securities had been purchased on an American exchange, or where there were improper foreign transactions in American securities.

In our view, subject matter jurisdiction attaches whenever there has been significant conduct with respect to the alleged violations in the United States. And this is true even though the securities are foreign ones that had not been purchased on an American exchange. See, Leasco Data Processing Equipment Corporation v. Isidore Kerman, 468 F.2d 1326, 1334 (2nd Cir. 1972); Restatement (Second) of Foreign Relations Law of United States § 17 (1965).[15]

Thus, the essential issue is whether the defendants' conduct in the United States was of such significance to subject them to the jurisdiction of the District Court. We believe it was.

The affidavits and exhibits filed by the parties reveal that conduct in the United States was involved in the following incidents: [16]

*May 25, 1968*—Anthes, in Canada, mailed a form letter to some United States shareholders. The letter, signed by Anthes President D. G. Willmot, stated that the tender offer was "being restricted at this time to Canadian residents," and that:

"I want you to know that we are fully aware of the restrictions which affect you as a U.S. shareholder and that *the protection of your position is very much in our minds.*

"You will be advised further as details of the transaction are finalized with respect to the future of your shareholdings." (Emphasis added.)

*June 14, 1968*—Willmot, in Canada, wrote Glen Travis, in the United States, stating that he had arranged for a copy

---

1968)] held § 10(b) to be applicable, *even when the fraudulent acts were all committed outside the United States* and the security was that of a foreign company doing no business in the United States, in a case where 'the transactions involve stock registered and listed on a national securities exchange, and are detrimental to the interests of American investors.' 405 F.2d at 208. * * *" (Emphasis included.)
*Id.* at 1333

15. Section 17, "Jurisdiction to Prescribe with Respect to Conduct, Thing, Status or Other Interest Within Territory," of the Restatement (Second) of Foreign Relations Law of the United States (1965) provides:
"A state has jurisdiction to prescribe a rule of law
"(a) attaching legal consequences to conduct that occurs within its territory, whether or not such consequences are determined by the effects of the conduct outside the territory, and
"(b) relating to a thing located, or a status or other interest localized, in its territory."
Chief Judge Friendly applied the Restatement's § 17 as follows:
" * * * While the black letter seems to require that, in a case like this, not only there should be conduct within the territory but also the conduct relate 'to a thing located, or a status or other interest localized, in its territory,' Comment A and illustrations 1 and 2, * * * appear to be satisfied if there has been conduct within the territory. Conduct within the territory alone would seem sufficient from the standpoint of *jurisdiction* to prescribe a rule. * * *" (Emphasis included.)
Leasco Data Processing Equipment Corporation v. Isidore Kerman, *supra*, 468 F.2d at 1334.
Moreover, clause (b) of § 17 is met here because the defendants' conduct in the United States was directly related to and affected the interests of Anthes U.S. shareholders.

16. It is clear that both the place of sending and place of receipt constitute locations in which conduct takes place when the mails or instrumentalities of interstate commerce are used to transmit communications. See Leasco Data Processing Equipment Corporation v. Isidore Kerman, *supra*, 468 F.2d at 1335. See also, Hooper v. Mountain States Securities Corporation, 282 F.2d 195, 205 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

of the May 25, 1968, letter to be delivered to Travis's attorney in St. Louis, Missouri.

*May 27, 1968 to June 1, 1969*—Travis, in St. Louis, had several telephone conversations with officers and directors of the corporate defendants in Canada and the United States concerning the effect on his interests of the tender offer and merger. According to the plaintiffs' version of these conversations, the plaintiffs were to receive, after the expiration of the Canadian tender offer, an offer which would provide for them an after-tax result substantially equivalent to that received by the Canadian shareholders.[17]

*July 12, 1968*—George S. Thomas, an associate of Travis's St. Louis, Missouri, counsel, telephoned H. Avery Rafuse, a vice president of the John Wood Company in East Orange, New Jersey.[18] Rafuse assured Thomas that a tax-free exchange was in the offing but that nothing specific could be given in writing at that point for fear that such would result in taxation of the exchange. According to Thomas, Rafuse stated that plaintiffs "should wait until the Spring of 1969 at which time Molson would make some effort to effect another tax-free exchange with the Travises, and thus avoid the 'step transaction' taint."

*December 24, 1968*—Willmot, in Canada, wrote Travis, in St. Louis, Missouri, stating in part:

"As you know, we are continuing to work with your Canadian counsel in Montreal [19] with the hope of developing, in the light of existing U.S. tax laws and securities regulations, an expedient and financially feasible method of dealing with the Anthes common shares held by you, having regard to all pertinent circumstances, including the other U.S. resident Anthes Shareholders."

*June 26, 1969*—Defendant Kenneth F. Gates, Molson Vice President-Law, in Canada, notified John J. Cole, Travis's St. Louis counsel, in St. Louis, by telephone, that no tax-free or equivalent ex-

---

17. Defendants or their representatives who participated in these calls include: (1) Defendant E. H. Orser, initially a Vice President of Anthes and later Senior Vice President-Corporate Development of Molson; (2) Mr. Scott, a director and employee of Dominion; (3) Defendant D. G. Willmot, President and Chief Executive Officer of Anthes and later occupying the same positions in Molson; (4) Defendant Senator Hartland de M. Molson, Chairman of Molson's Board of Directors.

Travis stated in his affidavit:
" * * * [O]n each occasion [Orser] told me not to worry about the pending tender offer because Anthes and Molson were looking into the situation with respect to protecting Travis' shareholdings. He told me that they would work out a deal for us because Anthes and Molson could not afford to mistreat American shareholders, particularly since those companies did so much business in the United States. Mr. Orser's comments were generally reassuring and indicated that the Travises would be afforded a tax-free exchange or their shares would be acquired on some basis so as to compensate us on an equivalent, net after tax, basis with the Canadian shareholders. He kept telling me to be patient and to wait until the matter could be worked out."

18. The John Wood Company is a wholly-owned subsidiary of Anthes, and Mr. Rafuse had negotiated the tax aspects of Anthes' acquisition of Travis's Multiplex Company stock in 1966. Thomas contacted him " * * * to find out what, if anything, was being done to provide a tax-free exchange of Anthes stock held by United States resident shareholders of Anthes." A question of Rafuse's authority to speak for the defendants is at issue and will have to be resolved at trial.

19. On July 11, 1968, on their St. Louis counsel's advice, the Travises had employed Gerald McCarthy of Montreal, Canada, to serve as their Canadian counsel. Many contacts, wholly within Canada, took place between McCarthy and Purdy Crawford, Molson's outside counsel, relating to a separate offer for the plaintiffs. Crawford, according to the correspondence in the exhibits, also suggested that the Travises defer any action until after the expiration of the offer to Canadian shareholders and that, thereafter, the Travises should consider tendering their stock to Molson. This information was relayed by McCarthy to Travis in the United States.

change of plaintiffs' Anthes stock for Molson stock would be made and that unless the Travises sold their stock to Molson on stated terms by the end of the following day, Molson would withdraw its support of the market for Anthes stock. See, n. 5 and accompanying text, *supra*.[20]

*July 9, 1969*—The closing of the sale took place in St. Louis, Missouri. Molson was represented at this closing by two of the individual defendants—Kenneth F. Gates and Morgan McCammon, Molson Senior Vice President-Corporate Services. Moreover, a number of telephone calls between the defendants in Canada and the plaintiffs in the United States arranging for this closing also took place.

*October 14, 1969*—A Molson officer wrote a letter to the remaining Anthes common shareholders advising them of the results of the tender offer and expressing interest in acquiring further Anthes shares for cash. This letter was not received by any of the named plaintiffs, but it was received by those persons whom the plaintiffs seek to join in a class action. See, n. 12, *supra*.

■ If the incidents listed above are considered in their totality, it is clear that they were of such significance as to subject the defendants[21] to the jurisdiction of the trial court. The incidents were essential elements in a slowly unfolding scheme to defraud the plaintiffs involving the use of the mails and instrumentalities of interstate commerce.

Jurisdiction is not lost because some significant steps in the fraudulent scheme took place in Canada. Leasco Data Processing Equipment Corporation v. Isidore Kerman, *supra*, 468 F.2d at 1335, 1337. Here, as in *Leasco*, the scales are tipped in favor of applicability because misrepresentations were made in the United States. *Id.* at 1337. Nor is jurisdiction lost because the securities were foreign securities neither registered nor traded on an organized United States market. Leasco Data Processing Equipment Corporation v. Isidore Kerman, *supra*, 468 F.2d at 1336; Sup't of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 10, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

The trial court's erroneous finding that there were not significant contacts with the United States and that the objectionable conduct took place in Canada and not the United States resulted from three misconceptions.

■ First, the court was of the view that the contacts were insignificant because they were initiated by the plaintiffs—*i. e.*, the letters were in response to Travis's inquiries and in most, though not in all cases, the plaintiffs or their representatives telephoned the defendants or their representatives. In our opinion, it is not material who initiated the communications. Instead, the real question is whether the mails or instrumentalities of interstate commerce were used to mislead the plaintiffs. The defendants were not forced in these communications to make misrepresenta-

---

**20.** Cole also stated in his affidavit that Gates insisted the offer to sell must come from the plaintiffs to Molson by telegram. The appropriate telegram offering to sell was sent from St. Louis to Canada, and Molson, in turn, sent a telegram accepting the plaintiffs' offer to sell from Canada to St. Louis, Missouri.

**21.** Dominion has argued in its brief that it is exempt from application of § 10(b) of the Securities Act of 1934 because it is a person transacting a business in securities outside of the United States. Section 30(b) of the Act, 15 U.S.C.

§ 78dd(b), does provide for this exemption, but it is a very narrow exemption. We do not believe that a broker is entitled to this exemption when, as here, the transaction involved is one which to a significant degree has taken place within the United States, has caused injury to United States investors, and the jurisdiction is grounded upon more than an incidental use of mails or the facilities of interstate commerce. See generally, Note, United States Taxation and Regulation of Offshore Mutual Funds, 83 Harv.L.Rev. 404, 442–452 (1969).

tions to the plaintiffs. We are aware of no case law on this point which is contrary to the view we express here. Further, we believe commonsense requires the rejection of the argument that a person could freely communicate a misrepresentation by the mails or an instrumentality of interstate commerce without fear of violating § 10(b) of the Act, if the defrauded party had initiated the communication.

Second, the court stated that communications and correspondence to United States resident shareholders regarding the tender offer could not be the basis of conduct in the United States because the lack of a tender offer and not the tender offer itself is the subject of the plaintiffs' complaint. This reasoning is in error to the extent that those communications with the plaintiffs with respect to the tender offer also led the plaintiffs to believe that a separate offer would be made to them. A number of the contacts recited above had this dual aspect and are, therefore, significant contacts.

■ Third, we also view the closing and communications leading thereto as significant contacts within the jurisdiction even though they were made at a time when the plaintiffs were aware of the defendants' true intentions and were thus not misleading. These contacts were the final stage of the defendants' alleged scheme to defraud the named plaintiffs which began with the limitation of the tender offer to Anthes Canadian shareholders and continued on through the acquisition of plaintiffs' shares by Molson. They were essential to the alleged scheme and may not be ignored in determining the propriety of subject matter jurisdiction.

### COUNT I—Claim 2

■ The essence of the plaintiffs' complaint with respect to this claim is that the defendants violated § 10(b) and Rule 10b–5 by engaging in self dealing. The defendants deny that they engaged in self dealing but contend that, in any event, self dealing is not prohibited by the statute or the rule. They also argue that neither the statute nor the rule regulates self dealing in Canadian securities in Canada.

We have reviewed the recent case law dealing with the coverage of § 10(b) and Rule 10b–5, and conclude that the self dealing alleged to exist here constitutes conduct actionable under § 10(b) and Rule 10b–5. See, Sup't of Insurance v. Bankers Life & Cas. Co., *supra* at 10, 92 S.Ct. 165. Here, as in *Sup't of Insurance*, the defendants' self dealing was a violation of a fiduciary obligation to minority shareholders and not just "mere internal corporate mismanagement." Moreover, as we have pointed out in an earlier section of this opinion, the requirement that the fraud be in connection with* a sale or purchase is satisfied. We are also satisfied that the requisite use of interstate commerce or the mails has been met with respect to this claim.

We do not agree with the trial court that Erling v. Powell, 429 F.2d 795 (8th Cir. 1970); Iroquois Industries, Inc. v. Syracuse China Corporation, 417 F.2d 963 (2nd Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); or Mutual Shares Corporation v. Genesco, Inc., 384 F.2d 540 (2nd Cir. 1967), require a contrary result. All are distinguishable on their facts, and all were decided before the Supreme Court handed down its decision in Sup't of Insurance v. Bankers Life & Cas. Co., *supra*. See, Jannes v. Microwave Communications, Inc., 461 F.2d 525 (7th Cir. 1972).

Because *Erling* is a decision of this Court, a further comment is in order. In that case, the fraud was not in connection with the sale of a security and the plaintiff was not damaged by the actions of the defendant. Here, the alleged fraud involved a sale and allegedly damaged the plaintiffs.

■ We are also persuaded that § 10(b) and Rule 10b–5 are applicable to the defendants' self dealing, even if it is

assumed that all such dealings took place in Canada. "It is settled law * * * that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends * * * ", United States v. Aluminum Co. of America et al., 148 F.2d 416, 443 (2nd Cir. 1945); see, Ohio v. Wyandotte Chemicals Corp., 401 U.S. 493, 500–501, 91 S. Ct. 1005, 28 L.Ed.2d 256 (1971), provided only that:

"(a) the conduct and its effect are generally recognized as constitutent elements of a crime or tort under the law of states that have reasonably developed legal systems, or

"(b)(i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems."

Restatement (Second) of Foreign Relations Law of the United States (1965) § 18.

Each element of (b) is present here. The self dealing in Canada and resulting diminution in the value of the plaintiffs' stock and lesser dividends received by Anthes shareholders in the United States are constituent elements of activity to which the statute and rule apply; the effect on the value of the plaintiffs' stock is substantial; the diminution occurred as a direct and foreseeable result of the conduct outside the territory; and the rule is not inconsistent with principles of justice generally recognized by states that have reasonably developed legal systems.[22]

Moreover, this is not a situation in which American citizens have gone to Canada and purchased stock in a Canadian corporation. It is rather a case in which a Canadian corporation came to the United States and acquired control of an American company by giving the American shareholders stock in the Canadian corporation. Under such circumstances, the reasonableness of requiring the Canadian corporation to treat its American shareholders fairly is obvious.

## SUBJECT MATTER JURISDICTION —COUNT II

■ Count II of the complaint is a common law action incorporating for the most part both claims under Count I. Fraud and breach of fiduciary duties are alleged to have been committed by the defendants. Plaintiffs contend that subject matter jurisdiction over this count rests in the District Court on diversity of citizenship and pendent jurisdiction principles. We are persuaded that the trial court has pendent jurisdiction over Count II and, therefore, it is unnecessary to examine the alternate ground.

The District Court has the power to exercise pendent jurisdiction in this case because substantial federal claims have been alleged providing the primary basis for jurisdiction, and the common law claims alleged in Count II are derived from the same "nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L. Ed.2d 218 (1966).

Moreover, we are convinced that pendent jurisdiction should, as a matter of discretion, be exercised here. We believe that considerations of judicial economy and the best interests of the parties in terms of fairness and convenience compel the conclusion that all claims should be heard in one proceeding. See, Drachman v. Harvey, 453 F. 2d 722 (2nd Cir. 1971), reversed on rehearing, 453 F.2d 736, 738 & n. 4 (1972) (en banc).

## VENUE

■ At the outset, we note that for practical purposes, our decision with re-

22. *See, e. g.*, J. Stewart and M. Palmer, Company Law of Canada (5th Ed. 1962) 588–594.

spect to subject matter jurisdiction also decides the question of venue. Whatever significant conduct there was in the United States occurred in the Eastern District of Missouri. And whatever consequences there were in the United States from actions in Canada were felt in the same district. Thus if the case is to be tried at all, it must be tried in the Eastern District.

Specifically, venue with respect to Count I, Claim 1, was properly laid in the district because several significant acts constituting the violation occurred there. See, pp. 521–523, *supra*; 15 U.S.C. § 78aa; Matheson v. Armbrust, 284 F.2d 670, 673 (9th Cir. 1960), cert. denied, 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed. 2d 860 (1961); Hooper v. Mountain States Securities Corporation, 282 F.2d 195 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); Errion v. Connell, 236 F.2d 447, 455 (9th Cir. 1956).

Venue with respect to Count I, Claim 2, lies in the district because it is where the consequences of the Canadian action were felt and where some acts and transactions constituting the violation occurred.

 There is pendent venue with respect to Count II for essentially the same reasons as there is pendent subject matter jurisdiction with respect to that count. See, 5 L. Loss, Securities Regulation (2nd Ed.Supp.1969) at 2975.

## PERSONAL JURISDICTION

Although the question of personal jurisdiction was not reached by the trial court, it was thoroughly briefed and argued to us and is so closely related to the question of subject matter jurisdiction that we decide it with respect to some defendants and remand as to others.

Section 27 of the 1934 Act provides in part:

" * * * Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. * * * "

15 U.S.C. § 78aa.

This section has been held to indicate a Congressional intent to extend personal jurisdiction to the full reach permitted by the Due Process Clause:

" * * * While Congress was doubtless thinking mainly in terms of exercising its power 'to provide that the process of every District Court shall run into every part of the United States,' * * * use of the word 'wherever', rather than 'where' or 'in which', demonstrates an intention to authorize service on a defendant who can be 'found' only in a foreign country, and although the section does not deal specifically with *in personam* jurisdiction, it is reasonable to infer that Congress meant to assert personal jurisdiction over foreigners not present in the United States to but, of course, not beyond the bounds permitted by the due process clause of the Fifth Amendment. * * * "

Leasco Data Processing Equipment Corporation v. Isidore Kerman, *supra*, 468 F.2d at 1340.

 Accordingly, personal jurisdiction can be acquired over the defendants who have acted within the district or sufficiently caused foreseeable consequences there, by service of process on them in Canada. See, McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Leasco Data Processing Equipment Corporation v. Isidore Kerman, *supra*, 468 F.2d at 1339–1344.

On the basis of these principles, the trial court has personal jurisdiction over defendants J. D. Molson, Orser and Willmot—Molson because he was served with process in the Eastern District of Mis-

souri, see Restatement (Second) of Conflict of Laws (1971) § 28, and the others because they are shown to have engaged in conduct within the district or to have acted in such a way as to cause foreseeable consequences therein. See, *Id.* at §§ 36 and 37; see also, Restatement (Second) of Foreign Relations Law of the United States, *supra*, § 18.

The trial court also has personal jurisdiction over Anthes and Molson because appropriate officers of each corporation were personally served in the district and in Canada, and because the record reveals that both corporations through responsible officers and agents engaged in conduct within the district or acted in such a way as to cause foreseeable consequences therein. See, Restatement (Second) of Conflict of Laws, *supra*, §§ 49 and 50; Restatement (Second) of Foreign Relations Law of the United States, *supra*, § 18.

We do not decide whether personal jurisdiction exists as to the remaining defendants, corporate and individual. The record before us does not sufficiently show that they personally engaged in conduct within the district or caused foreseeable consequences therein. The trial court is directed to decide whether personal jurisdiction exists as to these defendants on remand, after it has given the plaintiffs an adequate opportunity for discovery.

## SUMMARY

We hold: (1) that the trial court has subject matter jurisdiction over Counts I and II; (2) that venue is properly laid with respect to all counts; (3) that the court has personal jurisdiction over Anthes, Molson and some of the individual defendants—J. D. Molson, Orser and Willmot; and (4) that the question of personal jurisdiction over the remaining defendants and whether the action may proceed as a class action are to be determined by the court after the plaintiffs have been given discovery. No issues were raised on this appeal with respect to the insufficiency of service of process or failure to state a claim upon which relief may be granted.

We reiterate our position that our statements herein should not be interpreted as expressing an opinion on the merits of the instant case. In the event that the facts proven at trial should differ from those we have accepted as true, then, of course, the issues dependent upon those facts should be disposed of in accordance with the proven facts.

Reversed and remanded for action consistent with this opinion.