STATE of Tennessee, James E. Word, Commissioner, Tennessee Department of Health and Environment, and the Tennessee Wildlife Resources Agency, Plaintiffs/Appellees,

v.

CHAMPION INTERNATIONAL CORPORATION, d/b/a Champion Papers, Defendant/Appellant.

Supreme Court of Tennessee, at Nashville.

April 21, 1986.

Charles H. Warfield, Nashville, for defendant/appellant.

Frank J. Scanlon, Deputy Atty. Gen., Michael D. Pearigen, Asst. Atty. Gen. (W.J. Michael Cody, Atty. Gen. and Reporter, of counsel), for plaintiffs-appellees.

## OPINION

HARBISON, Justice.

Appellant operates a paper mill at Canton, North Carolina. It discharges chemical waste therefrom into the Pigeon River at a point several miles inside the borders of the State of North Carolina. Prior to 1981 it held valid permits from the State of North Carolina issued pursuant to and in conformity with the laws of that state as authorized by the Federal Water Pollution Control Act Amendments of 1972 (herein "FWPCA"), 33 U.S.C. §§ 1251 *et seq.* Appellant duly applied for renewal of its permit in 1981, and administrative proceedings with reference to that renewal were pending when the present action was brought in July 1983.

In this action the State of Tennessee and certain of its environmental officials sought an injunction and civil penalties pursuant to Tennessee statutes and common law, alleging that the effluent from appellant's plant had polluted the Pigeon River below the point of discharge and throughout the course of the river in Tennessee.

Both the Chancellor and the Court of Appeals held that this action could be maintained and overruled a motion for summary judgment filed by appellant.[1] The action was brought in a Tennessee state court at Nashville. Appellant is qualified to do business in the State of Tennessee and owns large tracts of land therein, so that it is generally subject to the jurisdiction of the courts of the state.

---

1. Appellant actually filed a motion to dismiss pursuant to T.R.C.P. 12.02(1) and (6). In support an affidavit and detailed exhibits were filed, all of which were considered by the courts below, so that the motion should have been treated as one for summary judgment pursuant to Rule 56, T.R.C.P. insofar as it was based upon T.R.C.P. 12.02(6). No counter affidavits or other opposing evidence was offered by appellees.

After careful consideration of the issues, we are of the opinion that the motion for summary judgment was well taken and should have been sustained. Accordingly we reverse and dismiss.

There is no dispute as to any material facts. The question presented is whether or not the state and its officials may, under controlling federal authorities, maintain an action in local state courts under local law against a permit holder discharging effluent into interstate waters, the point of discharge being outside the territorial boundaries of the plaintiff. In our opinion neither the federal statutes nor the state statutes relied upon by appellees authorize such an action.

In their complaint appellees invoke state court jurisdiction pursuant to T.C.A. §§ 69-3-115 and 117(c) and T.C.A. § 29-3-102. The latter has to do with the abatement of public nuisances generally. The first two sections are portions of the state "Water Quality Control Act of 1977."

The latter is a detailed statute recognizing that the waters of the state are held in public trust and that the people of the state have a right to unpolluted waters. One of the declared purposes of the statute was to abate existing pollution of state waters, to reclaim polluted waters, to prevent future pollution and to plan for future use of state waters so that the water resources of the state might be used and enjoyed to the fullest extent consistent with the maintenance of unpolluted waters.

One of the specific purposes of the Act was:

"... to enable the state to qualify for full participation in the national pollutant discharge elimination system established under Section 402 of the Federal Water Pollution Control Act, Public Law 92-500."[2] T.C.A. § 69-3-102(c).

The statute provides a comprehensive scheme for the control of pollution of the waters of the state, the latter being defined as:

"... any and all water, public or private, on or beneath the surface of the ground, which are contained within, flow through, or border upon Tennessee or any portion thereof...."

except water confined to private property. T.C.A. § 69-3-103(28).

The statute creates an administrative agency with numerous duties pertaining to the quality and purity of waters within the state. This agency is authorized to issue permits to individuals or companies discharging effluent into state waters. T.C.A. § 69-3-108. The agency is authorized to cooperate closely with the Administrator of the Federal Environmental Protection Agency and "to enter into agreements with other states and the United States relative to prevention and control of pollution in interstate waters." T.C.A. 69-3-107(7)(B).

Discharge permits issued by the Tennessee agency govern discharges from specific point sources. It has been held, however, that federal agencies operating within the state are not subject to the Tennessee discharge permit program where pollution does not result from the discharge of an effluent from a point source, but from another cause such as the existence of a Tennessee Valley Authority dam. *See United States ex rel. T.V.A. v. Tennessee Water Quality Control Board*, 717 F.2d 992 (6th Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984).

The portions of the Water Quality Control Act under which this suit was brought authorize penalties for violation of effluent standards or water quality standards established by the Water Quality Control Board. We find nothing in the statute purporting to give the Board authority to impose penalties or to seek an injunction against the holder of a valid discharge permit issued by the United States Environmental Protection Agency or by an appropriate administrative agency of another state.

It is clear from the Tennessee statute that the General Assembly intended for

2. 33 U.S.C. § 1342.

this state to participate fully in a national program for the control and abatement of pollution. T.C.A. § 69–3–105(h)(1) states:

"The board shall have and exercise the power, duty, and responsibility to adopt, modify, repeal, and promulgate all necessary rules and regulations for the purpose of establishing and administering a comprehensive permit program that will enable the division of water quality control of the department of public health to be designated by the United States environmental protection agency as authorized to issue permits under the national pollutant discharge elimination system established by Section 402 of the Federal Water Pollution Control Act, Public Law 92–500."

It is clear that the state statutes confer broad authority upon Tennessee officials to control discharge of pollutants within the boundaries of the state, including any rivers and streams forming such boundary. Where the point of discharge lies in another jurisdiction, however, it is necessary to examine federal law and federal authorities to determine whether the state may impose its law upon the holders of valid discharge permits issued by the United States government or by another state pursuant to authority granted by federal legislation.

Prior to the adoption in 1972 of the FWPCA, the Supreme Court of the United States had indicated that state law governed the pollution of interstate or navigable waters. *Ohio v. Wyandotte Chemicals Corp.*, 401 U.S. 493, 498 n. 3, 91 S.Ct. 1005, 1009 n. 3, 28 L.Ed.2d 256 (1971). In 1972, however, shortly before adoption of the FWPCA, the Court held otherwise and overruled its contrary indication in the *Wyandotte* case, *supra.* It expressly held that federal common law, rather than internal state law, must govern in actions to abate nuisances or control pollution in interstate waters. *Illinois v. Milwaukee*, 406 U.S. 91, 102 n. 3, 92 S.Ct. 1385, 1392 n. 3, 31 L.Ed.2d 712 (1972).

Shortly after the release of the opinion in that case, the federal legislation now known as the Federal Pollution Control Act Amendments of 1972, 33 U.S.C. §§ 1251 *et seq.* was adopted by the United States Congress. Thereafter the Supreme Court of the United States held that the provisions of that statute preempted federal common law in interstate water pollution cases. *Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). It vacated a decision of the United States Court of Appeals for the Seventh Circuit which had held to the contrary and which had authorized the imposition of more stringent standards of pollution control under federal common law than those required under the recent federal statute.

While in that opinion the Supreme Court of the United States did not expressly consider the question of whether one state could impose its laws and regulations upon the holder of a discharge permit in another state, shortly after the release of its opinion it denied a petition for certiorari filed by the State of Illinois specifically raising that question. *Illinois v. Milwaukee*, 451 U.S. 982, 101 S.Ct. 2313, 68 L.Ed.2d 839 (1981).

Upon remand, the *Milwaukee* case was consolidated in the United States District Court for the Northern District of Illinois with two other cases, and the litigation again reached the Court of Appeals for the Seventh Circuit. That court held that the FWPCA precludes application of one state's common law or statutory law to determine liability and to afford a remedy for discharges within another state. *Illinois v. Milwaukee*, 731 F.2d 403 (7th Cir. 1984). Thereafter the Supreme Court of the United States denied certiorari in that case and the other cases which had been consolidated with it. *Scott v. City of Hammond*, —— U.S. ——, 105 S.Ct. 979, 83 L.Ed.2d 981 (1985).

■ We interpret the foregoing authorities to hold that federal legislation is preemptive of both federal common law and state law in the area of control of pollution in interstate waters and that environmental agencies of one state may not take official action against a permit holder

from another state except as authorized by the federal statutes.

■ While there is some contrary authority, we are of the opinion that this is the better view of the subject. It is clear under the federal statutes that one seeking to discharge effluents into interstate waters need seek a permit only in the state where the discharge originates, and not in other states which may be affected by the discharge. *See Lake Erie Alliance for Protection of Coastal Corridor v. U.S. Army Corp. of Engineers*, 526 F.Supp. 1063 (W.D.Pa.1981), *aff'd* 707 F.2d 1392 (3rd Cir.1981), *cert. denied*, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983)); *Commonwealth of Kentucky ex rel. Stephens v. U.S. Nuclear Regulatory Commission*, 626 F.2d 995 (D.C.Cir.1980).

■ Under these authorities, it is clear that appellant in the present case was not required to seek a discharge permit from the State of Tennessee for its North Carolina paper mill, even though the stream into which the discharge emptied flowed after a course of several miles into the borders of Tennessee. Appellant has not applied for a permit from Tennessee, and has not violated the conditions of any Tennessee permit.

It appears that the contents of the effluent discharged by appellant are such that had the point of discharge been located in this state, a permit would not have been issued without more stringent limitations than those imposed by the State of North Carolina. It further appears, however, that both North Carolina and Tennessee are authorized under the federal statutes to issue permits, and that the effluent standards and limitations of both states meet and exceed the minima required under the federal statutes.

In its second opinion in the Illinois-Milwaukee litigation, the Supreme Court of the United States held that the holder of a Wisconsin permit could not be subjected to more stringent requirements at the suit of another state under principles of federal common law. As previously stated, the Court later denied a separate petition for certiorari seeking to impose more stringent limitations under the statutory and common law of the complaining state, Illinois.

With reference to the FWPCA of 1972, the Court said:

> "Congress' intent in enacting the Amendments was clearly to establish an all-encompassing program of water pollution regulation. *Every* point source discharge is prohibited unless covered by a permit, which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goals. The 'major purpose' of the Amendments was 'to establish a *comprehensive* long-range policy for the elimination of water pollution.' ... This Court was obviously correct when it described the 1972 Amendments as establishing 'a comprehensive program controlling and abating water pollution.' *Train v. City of New York*, 420 U.S. 35, 37, 95 S.Ct. 839, 841, 43 L.Ed.2d 1 (1975). The establishment of such a self-consciously comprehensive program by Congress, which certainly did not exist when *Illinois v. Milwaukee* was decided, strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." 451 U.S. 318–319, 101 S.Ct. at 1793 (1981). (Emphasis in original.)

The federal legislation prescribes a system for the issuance of permits for discharges at specific point sources as a part of the national pollution discharge elimination system.[3] 33 U.S.C. § 1342(a). Subsection 5 of this section provides in part as follows:

> "The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objective of this

---

**3.** The term "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

chapter, to issue permits for discharges into the navigable waters *within the jurisdiction of such State."* (Emphasis added.)

In 33 U.S.C. § 1342(b) there are elaborate provisions for state permit programs, and by subsection (c) it is provided that the federal program of permits will be suspended during such time as the state permit program complies with the federal statutory requirements. It is undisputed that both North Carolina and Tennessee have qualified to issue permits under this national program, and that their effluent requirements are equal to or exceed minimum federal requirements. The Tennessee requirements, however, are more stringent than those of North Carolina.

■ It is clear that state law has not been preempted by the national law, but that it plays an important part in the national program. Each state, however, clearly operates within the sphere of its own jurisdiction, and may not issue permits for or control points of discharge lying within the jurisdiction of other states. The provisions of both the federal and state statutes applicable to this action must be read and construed in light of those basic principles.

■ The provisions for state permit programs themselves make it abundantly clear that each state is to act with respect to the waters lying within its own jurisdiction, but that it must take cognizance of the flow of waters into other jurisdictions. One of the conditions of approval of a state permit program by the Administrator of the Environmental Protection Agency is that program must:

"... insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application...." 33 U.S.C. § 1342(b)(3).

Further, each state program must:

"... insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing...."

33 U.S.C. § 1342(b)(5).

The North Carolina permit program meets these requirements, and the record shows that Tennessee officials were participating in the renewal of appellant's permit in North Carolina administrative proceedings at the time the present action was brought.

The federal statutes provide that the federal Administrator has power to deny the issuance of any permit under a state program. 33 U.S.C. § 1342(d)(2).

[6] The federal statutes also provide for civil actions to be brought against any violator of a permit, or against the Administrator, by any person having an interest adversely affected, including a state. 33 U.S.C. § 1365(a). Such actions are to be brought in the judicial district in which the point source of discharge is located. 33 U.S.C. § 1365(c).

The federal statutes also provide:

"A Governor of a State may commence a civil action under subsection (a) of this section, without regard to the limitations of subsection (b) of this section, against the Administrator where there is alleged a failure of the Administrator to enforce an effluent standard or limitation under this chapter the violation of which is occurring in another State and is causing an adverse effect on the public health or welfare in his State, or is causing a violation of any water quality requirement in his State." 33 U.S.C. § 1365(h).

One United States District Court has disagreed with the conclusions of the Seventh Circuit Court of Appeals in *Illinois v. Mil-*

*waukee,* 731 F.2d 403 (7th Cir.1984) and has held that private citizens of one state may sue an out-of-state polluter under the common law of the state where their property is located, even though the defending party has a valid permit in another jurisdiction. *See Ouellette v. International Paper Co.,* 602 F.Supp. 264 (D.Vermont 1985). This decision was recently affirmed in a memorandum opinion by the Second Circuit Court of Appeals. 776 F.2d 55 (1958).[4]

The court in that case, like the lower courts in the present litigation, relied heavily upon a general savings clause appearing in the federal legislation contained in 33 U.S.C. § 1370, as follows:

"Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (b) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this chapter; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States."

The Supreme Court of the United States noted the foregoing provision and after quoting it in a footnote said:

"It is one thing, however, to say that States may adopt more stringent limitations through state administrative pro-

cesses, or even that States may establish such limitations through state nuisance law, and apply them to in-state discharges. It is quite another to say that the States may call upon *federal* courts to employ *federal* common law to establish more stringent standards applicable to *out-of-state* dischargers." *Milwaukee v. Illinois,* 451 U.S. 304, 327–328, 101 S.Ct. 1784, 1797–1798, 68 L.Ed.2d 114 (1981). (Emphasis in original).

We agree with the following observation of the Seventh Circuit Court of Appeals: "However, it seems implausible that Congress meant to preserve or confer any right of the state claiming injury (State II) or its citizens to seek enforcement of limitations on discharges in State I by applying the statutes or common law of State II. Such a complex scheme of interstate regulation would undermine the uniformity and state cooperation envisioned by the Act. For a number of different states to have independent and plenary regulatory authority over a single discharge would lead to chaotic confrontation between sovereign states. Dischargers would be forced to meet not only the statutory limitations of all states potentially affected by their discharges but also the common law standards developed through case law of those states. It would be virtually impossible to predict the standard for a lawful discharge into an interstate body of water. Any permit issued under the Act would be rendered meaningless. In our opinion Congress could not have intended such a result." *Illinois v. Milwaukee,* 731 F.2d 403, 414 (7th Cir.1984).

Although its denial of certiorari does not necessarily bind the Supreme Court of the United States to this interpretation of the statutes, we think that that denial, together with its earlier denial of a separate petition by Illinois, predicated upon the application of Illinois law, lends strong support to the construction given by the Seventh Circuit Court of Appeals.

---

**4.** Certiorari was granted in this case by the Supreme Court of the United States on March

25, 1986. *See* —— U.S. ——, 106 S.Ct. 1457, 89 L.Ed.2d 715.

The State in the present case makes a strong argument to the contrary. We have every sympathy with the State and its officials in an effort to abate pollution and to control the contamination of public waters. Nevertheless, the Tennessee General Assembly clearly expressed an intention to join a national program when it enacted the Tennessee Water Quality Control Act of 1977, and we believe that cognizance must be given to the role of other states which have also joined that program. A duly authorized permit from the Environmental Protection Agency or from an authorized state should, and, in our opinion, must, afford some protection to the holder thereof, who frequently has obtained it at enormous expense. The federal statutes contain ample provisions for other states and their citizens to enforce the terms of such permits, if they in fact are not met, and the permit process itself affords other states and their officials a significant participating role in the issuance or renewal of discharge permits.

For these reasons we are of the opinion that the motion for summary judgment filed by appellant was well taken and should have been sustained. The judgments of the courts below are reversed and the suit is dismissed at the cost of appellees. The cause will be remanded to the trial court for collection of costs accrued there and any further orders which may be necessary.

BROCK, C.J., and FONES and COOPER, JJ., concur.

DROWOTA, J., files dissent.

DROWOTA, Justice, dissenting.

After considering the authorities and statutes involved in this difficult case, I have concluded that it should not be dismissed, and I, therefore, respectfully dissent. Under the law of pre-emption, by the terms of these Federal and State Statutes, and pursuant to the reserved power of the State of Tennessee under the Tenth Amendment to the United States Constitution, this State has jurisdiction over a private interstate party with sufficient contacts with the forum and over waters running through its territorial boundaries. *See, e.g.,* 33 U.S.C. §§ 1251(b), 1251(g), 1365(e), 1365(h), 1370; T.C.A. § 69–3–103(28) (Supp.1985); *Kansas v. Colorado,* 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907).

In this case, the residents, wildlife, and other resources of Tennessee, and not those of North Carolina, are primarily damaged by the contamination of the Pigeon River. This case is wholly unlike a case involving a national waterway such as the Mississippi or Ohio Rivers or the Great Lakes, where sources of pollution are many and indeterminable. *Cf. Missouri v. Illinois,* 200 U.S. 496, 26 S.Ct. 268, 50 L.Ed. 572 (1906). The Pigeon River is clean above Champion's manufacturing facility, but it is fouled below it; no other source of pollution lies along its banks between Champion and the flow of the river into Tennessee. Champion is a privately held corporation; it does business in Tennessee and owns land in this State; it would for most other purposes be subject to the jurisdiction of Tennessee Courts. How does Champion differ from any other out-of-state tortfeasor subject to the longarm jurisdiction of a state? Exercising jurisdiction over Champion is neither unfair nor unforeseeable. Many interstate corporations must comply with the diverse laws and regulations of numerous states. *See, e.g., Phillips Petroleum Co. v. Shutts,* —— U.S. ——, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *Allstate Insurance Co. v. Hague,* 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). Tennessee must bear the costs of dealing with the pollution of the Pigeon River, which costs could be somewhat off-set by an award of damages or even wholly alleviated by an injunction.

In effect, the Majority is permitting the State of North Carolina to dictate the policy of this State. As the United States Supreme Court has noted in regard to the sovereign powers of the States under the Tenth Amendment:

"[No] state can legislate for, or impose its own policy upon the other. . . . One cardinal rule, underlying all the relations of the States to each other, is that of equality of right. Each state stands on the same level with all the rest. It can impose its own legislation on no one of the others, and is bound to yield its views to none."

*Kansas v. Colorado, supra,* 206 U.S. at 95–97, 27 S.Ct. at 666–667. By refusing to exercise jurisdiction in this case, the Majority permits the law and policy of North Carolina to remain unfrustrated, but that of Tennessee will be frustrated; whereas, if jurisdiction were exercised, the law and policy of both States would be enforced.

In this regard, I think that it is significant that the State is not suing the State of North Carolina or its political subdivisions but is seeking redress against a private party, Champion, who is subject to the dual jurisdiction of Federal and State Governments (including that of Tennessee as well as that of North Carolina). *Cf. Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.,* 452 U.S. 264, 286, 101 S.Ct. 2352, 2365, 69 L.Ed.2d 1 (1981). The exercise of State jurisdiction in this case is consistent with Constitutional principles of due process, full faith and credit, and federalism. Moreover, Congress has contemplated such a possibility in the Federal statutory scheme itself. *See, e.g.,* 33 U.S.C. §§ 1251(b), 1251(g), 1370. *Cf.* 33 U.S.C. §§ 1365(e), 1365(f).

Lending support to this result, a recent opinion of the United States Supreme Court analyzes the interaction of the States and Congress, noting that "the principal and basic limit on the federal commerce power is that inherent in all congressional action—the built-in restraints that our system provides through state participation in federal governmental action." *Garcia v. San Antonio Metropolitan Transit Authority,* —— U.S. ——, 105 S.Ct. 1005, 1020, 83 L.Ed.2d 1016 (1985). The Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1251, *et seq.,* allows State authority to be substituted for that of the Federal Government, apparently demonstrating the very interaction of State and Federal Governments of which Justice Blackmun conceived in *Garcia, supra. Cf. City of Milwaukee v. Illinois,* 451 U.S. 304, 341, 101 S.Ct. 1784, 1805, 68 L.Ed.2d 114 (1981) (*Milwaukee II*) (Blackmun, J., dissenting) ("Because the [FWPCA] contemplates a shared authority between the Federal Government and the individual States . . . it is entirely understandable that Congress thought it neither imperative nor desirable to insist upon an exclusive approach to the improvement of water quality."). Thus, the FWPCA specifically provides that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)." 33 U.S.C. § 1365(e). *See also Milwaukee II, supra,* 451 U.S. at 328, 101 S.Ct. at 1798 (this section of the FWPCA means exactly what it says). Significantly, the definition of "person" in the FWPCA includes a State. 33 U.S.C. § 1362(5).

Nothing I have found in the FWPCA reveals a Congressional intent to establish uniform standards, providing only for minimum standards and encouraging States to go further to achieve the goal of clean water as soon as possible. In this regard, the United States Supreme Court has suggested that uniformity may not be the required result in every case of this nature, having stated that "[t]he enactment of a federal rule in an area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress." *Milwaukee II, supra,* 451 U.S. at 313, 101 S.Ct. at 1790. *Cf. Garcia, supra,* 105 S.Ct. at 1017–1019. Congress has clearly incorporated the exercise of State jurisdiction into the FWPCA:

"It is the policy of the Congress to *recognize, preserve, and protect the primary responsibilities and rights of States* to

prevent, reduce, and eliminate pollution, to plan the development and use ... of land and water resources...."

33 U.S.C. § 1251(b) (emphasis added). *See also* 33 U.S.C. § 1370. In my opinion, the entire Federal statutory scheme demonstrates the Congress's intent that the States continue and even expand the exercise of jurisdiction in these cases to achieve the goal of unpolluted water. Being held to the standards of the State of North Carolina, when it is the State of Tennessee whose interests are most directly affected, defeats the purposes of the Tennessee Water Quality Control Act, T.C.A. § 69–3–101, *et seq.*, as well as undermines the structure of the FWPCA. In practice, relegating a State with more stringent standards to the lower standards of a bordering State for the sake of uniformity transforms the minimum Federal standards into the maximum standards for many interstate streams. I think that this result is contrary to the FWPCA and effectively prevents many States from enforcing their higher standards, which are clearly within their authority to enact, on any but their intrastate tributaries.

Furthermore, how any Commerce Clause purposes would be impaired by imposing Tennessee law on Champion is not clear. Champion will have to comply with one and only one standard, since compliance with Tennessee's standard will also comply with that of North Carolina; thus, the policies and laws of both States will be enforced. *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (*Milwaukee I*), foresaw that "a State with high water-quality standards may well ask that its strict standards be honored and that it not be compelled to lower itself to the more degrading standards of a neighbor." 406 U.S. at 107–108, 92 S.Ct. at 1395. *Cf. Milwaukee II, supra,* 451 U.S. at 341, 101 S.Ct. at 1805 (Blackmun, J., dissenting) ("[U]nder the statutory scheme, any permit issued by the EPA or a qualifying state agency does not insulate a discharger from

liability under other federal or state law.").[1] In this case, unwavering conformity to purposeless uniformity does not serve the interests of federalism or of the Commerce Clause. Every case carries with it its own equities, requiring in some circumstances at least that the State interest be considered as compelling as that of the Federal Government in uniformity.

> "The essence of our federal system is that within the realm of authority left open to them under the Constitution, the States must be equally free to engage in any activity that their citizens choose for the common weal, no matter how unorthodox or unnecessary anyone else ... deems state involvement to be."

*Garcia, supra,* 105 S.Ct. at 1015. *Garcia* then goes on to elaborate on this concept of federalism:

> "[The] Constitution of the United States ... preserves the autonomy and independence of the States—independence in their legislative and independence in their judicial departments. [Federal] [s]upervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution specifically authorized or delegated to the United States."

101 S.Ct. at 1017 (citation omitted). Since *Milwaukee II* has abrogated the federal common law in this area, in light of the comprehensive scheme of the FWPCA, and because the FWPCA itself purposefully preserves State common law and statutory remedies, then State jurisdiction over a private interstate party is not pre-empted. I emphasize the facts that in this case the source of pollution is certain, that Tennessee must bear the financial and physical burdens of the pollution, that this State has substantial contacts with Champion, and considering the insubstantial effect on commerce, pre-emption is neither required nor reasonable. *Cf. Hodel, supra,* 452 U.S. at 310, 101 S.Ct. at 2391 (Rehnquist, J., concurring) (emphasizing that these cases involve questions of degree and that the ef-

---

1. Justice Blackmun also reiterated that, as foreseen in *Milwaukee I,* the effect of *Milwaukee II* would be to allow States to resort to their own courts to enforce their more stringent standards on out-of-state polluting parties. 451 U.S. at 353, 101 S.Ct. at 1811.

fect on commerce must be substantial to justify federal pre-emption). *Cf. also Equal Employment Opportunity Comm. v. Wyoming,* 460 U.S. 226, 249, 103 S.Ct. 1054, 1062, 75 L.Ed.2d 18 (1983) (recognizing that considerations of degree are appropriate in some Tenth Amendment cases).

Additionally, Tennessee's case law establishes its own criteria for pre-emption in *State v. Scott,* 678 S.W.2d 50 (Tenn.1984), which follows the United States Supreme Court's cases in this area. Tennessee jurisdiction over the waters that flow within its borders is a matter within the police powers of the State, and as Justice Rehnquist noted in *Milwaukee II, supra:*

"[T]he appropriate analysis in determining if federal statutory law governs a question previously the subject of federal common law is not the same as that employed in deciding if federal law preempts state law. In considering the latter question, ' "we start with the assumption that the historic police powers of the States were not to be superceded by the Federal Act unless that was the clear and manifest purpose of Congress." ' *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)."

451 U.S. at 316, 101 S.Ct. at 1792. *Cf. Milwaukee II, supra,* 451 U.S. at 335, 101 S.Ct. at 1802 (Blackmun, J., dissenting) ("Long before the 1972 decision in [*Milwaukee I*], federal common law enunciated by this Court assured each State the right to be free from unreasonable interference with its natural environment and resources when the interference stems from another State or its citizens.") (citations omitted). Consistently with these principles, *Scott, supra,* found that these

"police powers ... are not to be preempted by federal legislation unless that was Congress' clear and manifest purpose. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 9 L.Ed. 1447 (1947). Pre-emption is compelled only if it is expressly stated in the statute or is implicit in the statute's structure and purpose. *Fidelity Federal Savings & Loan Ass'n. v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1892)."

678 S.W.2d at 51. Pre-emption is not clearly or manifestly intended and is not compelled by the structure and purpose of the Federal Statute—on the contrary, the FWPCA contains several provisions that preserve, incorporate, and encourage State jurisdiction.

Applying the criteria in *Scott, supra,* at 51, for deciding whether pre-emption has occurred in this case, I have concluded that no peculiarly pervasive Federal regulatory program is involved under the terms of the Federal Act itself and that the Federal interest is no more compelling than that of Tennessee's, especially considering that it is this State's water resource that is at stake. The exercise of Tennessee jurisdiction is wholly consistent with the objectives and obligations of the FWPCA. Requiring Champion to comply with the Federal and State regulations is not physically impossible, since compliance with Tennessee's standards fulfills those of North Carolina as well as those of the Federal Government under the provisions of the FWPCA. Champion will have to comply with only one non-conflicting standard, albeit the higher one. Any need for a uniform standard cannot be disserved by this requirement.

To find that State jurisdiction has been pre-empted in this case reduces the State to an administrative arm of the Federal Government. "The Tenth Amendment was invoked to prevent Congress from exercising its 'power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." *Garcia, supra,* 105 S.Ct. at 1029 (Powell, J., dissenting). Tennessee is not interfering with the objectives or interests of the State of North Carolina; this State is acting against a private party, and, if it is successful, its action will not only incidentally benefit North Carolina, but it also more fully serves the purposes of the FWPCA to eliminate pollution. Under the Full Faith and Credit Clause of the United States Consti-

tution, North Carolina would be obligated to enforce a Tennessee judgment rendered against a private tortfeasor under its long-arm jurisdiction. Moreover, the effect of Tennessee's action is not substantial upon interstate commerce. *See Hodel, supra,* 452 U.S. at 310–311, 101 S.Ct. at 2391 (Rehnquist, J., concurring). The FWPCA cannot "require the State to abandon [its] goals, or to abandon the public policy decisions underlying them." *Equal Employment Opportunity Comm. v. Wyoming, supra,* 460 U.S. at 239, 103 S.Ct. at 1062. No lack of comity to the State of North Carolina is implied, and I find it incongruous that North Carolina would ever defend as its public policy a right to pollute on the part of Champion.

This State has jurisdiction over the private party and over the subject matter in this case. No Federal interest is impaired or otherwise frustrated; rather, the interests of all—Tennessee, North Carolina, and the United States—are furthered. The State is acting within its legislative authority to achieve its public policy. Substantial State interests are involved in protecting the quality of water within its boundaries, which is a matter of uniquely compelling concern to the people who must use it. In view of the structure of the FWPCA and in the absence of any Federal common law, the exercise of Tennessee jurisdiction is protected by the Tenth Amendment to the United States Constitution. "This [Amendment] is not to be shorn of its meaning by any narrow or technical construction, but is to be considered fairly and liberally so as to give effect to its scope and meaning." *Kansas v. Colorado, supra,* 206 U.S. at 90–91, 27 S.Ct. at 664. Accordingly, I must respectfully dissent from the opinion of the majority.